LEVIN H. CAMPBELL, Circuit Judge.
 

 Eastern Air Lines appeals from the district court’s affirmance of an order of the bankruptcy court denying Eastern’s petition to recover certain money in the possession of defendant’s trustee in bankruptcy. We affirm.
 

 Morales Travel Agency, Inc. was in the business of selling to the public tickets for passage on various airlines, including Eastern. The business was run by Jose E. Morales Padilla, its sole stockholder, president, and treasurer. The relationship between Morales Travel Agency and the airlines was governed by the International Air Transport Association (IATA) Passenger Sales Agency Agreement, and by Resolutions of IATA under that agreement. Resolution 820(a) provided that the airlines would provide Morales (and other travel agencies) with blank tickets, or “travel documents,” which were to remain the property of the airlines until sold to passengers. The Resolution provided that, upon the sale of a ticket, Morales became responsible to pay the airline the price of the ticket, whether it actually collected that amount or not. Under the resolution, whatever money Morales did collect “shall be the property of the Carrier and shall be held by the Agent in trust for the Carrier or on behalf of the Carrier, until satisfactorily accounted for to the Carrier and settlement made.” The IATA Resolutions did not, however, require that Morales keep the proceeds of each airline’s ticket sales in separate accounts, nor that it keep the proceeds of all ticket sales in an account separate from any other business or personal funds. It was apparently Morales’ practice to commingle funds, from whatever source, in a single account. The IATA Resolutions also did not include any restrictions on the agent’s use of the ticket proceeds while in the agent’s possession. It appears that Jose Morales and his associates diverted some funds of the business, including ticket proceeds, to their personal use. Under IATA’s Resolution 810(a), the agent was required to furnish each airline with sales reports twice each month. At the time of each sales report, Morales was to remit to the airline the amount of the tickets sold during that sales period, less its commission.
 

 Morales Travel Agency was adjudicated bankrupt in August 1978. At that time, Morales’ possessions amounted to $356,314, consisting of $258,473 in accounts receivable, $57,241 in cash, and the rest in office equipment, an automobile, and a very small amount of real property.
 
 [1]
 
 Its debts, including the claim in question here, totalled $631,346.27. That amount included no secured claims, and only one claim having priority, a $1,500 debt for rent. The great majority of the claims were for airline tickets sold; by far the largest of these was Eastern’s claim for $379,482.29. The non-airline claims included $48,500 in bank loans for operation of the business, amounts ranging from $45 to $4,000 for various goods and services, and two judgment claims of $5,750 and $1,217.
 

 In September 1978, Eastern brought this action in the bankruptcy court, seeking to recover from the trustee in bankruptcy the $379,482.29 which Morales owed it for the
 
 *1071
 
 sale of its airline tickets. Eastern argued that, under the terms of the IATA Agreement, the proceeds of its tickets were its property, held in trust by Morales, and were not part of the estate in bankruptcy. A trial was held in July 1979, and on October 15, 1979, the bankruptcy court issued judgment against Eastern and allowed Eastern an unsecured claim without priority in the amount of $379,482.29.
 
 [2]
 

 Eastern then appealed to the United States District Court for the District of Puerto Rico, which at first affirmed the bankruptcy court on the ground that the relationship between Eastern and Morales was actually one of creditor and debtor, rather than one of trust, despite the language of the IATA Agreement, which the court found to be intended merely to ensure the debtor’s performance of its obligation. Upon Eastern’s motion for reconsideration, the district court revised its opinion to find that the contract did create a trust, but reached the same result on the ground that Eastern had failed to trace the trust funds into “specific or identifiable property” in the possession of the trustee. Eastern then brought this appeal.
 
 [3]
 

 Under section 70(a) of the Bankruptcy Act of 1898, which applies to Morales’ petition in bankruptcy, the trustee in bankruptcy acquired whatever title to property the bankrupt had. In the case of property held by the bankrupt in trust for another, the trustee would acquire the property subject to the interests of the trust beneficiary. 4A Collier, Bankruptcy ¶ 70.25[1], at 339 (14th ed. 1964). The burden, however, is on the claimant to establish the existence of a trust and to identify the property held in trust. 4A Collier ¶ 70.25, at 350, 354. Therefore, to prevail Eastern must show first that the proceeds of Morales’ sales of Eastern’s tickets were impressed with a trust in favor of Eastern, and second, that those proceeds still exist in identifiable form among Morales’ possessions. Eastern has failed at both these tasks.
 

 The terms of the IATA Agreement and Resolutions were inadequate, in our view, to give rise to a trust upon the proceeds from tickets sold by Morales to its customers. To be sure, Resolution 820(a) recited, in general terms, that the agent was to hold whatever monies it collected in trust for the carrier until accounted for, and that these monies were the carrier’s property until settlement occurred. However, talismanic language could not throw a protective mantle over these receipts in the absence of a genuine trust mechanism. Here the relationship remained in practical fact that of debtor-creditor. The contract nowhere required Morales to keep the proceeds of Eastern’s ticket sales separate from any other funds, whether Morales’ own funds or the proceeds of other airlines’ ticket sales. Nor was any specific restriction placed upon Morales’ use of the supposed trust funds. Morales was left free to use what it received for its own benefit rather than Eastern’s, and to transform the receipts into assets with no apparent encumbrance, upon which potential creditors might rely. The use of the word “trust” and the designation of the airline as titleholder, in a contract which is not publicly filed, would not save potential creditors from relying on such assets as office equipment, accounts receivable, and a bank account solely in the name of the agency. In the absence of any provision requiring Morales to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label “trust” could in these circumstances and for present purposes have no legal effect.
 
 [4]
 

 See In re Penn.
 
 
 *1072
 

 Central Transportation Co.,
 
 328 F.Supp. 1278 (E.D.Pa.1971); Scott on Trusts § 12.2 (3d ed.).
 

 Our conclusion is buttressed by other terms of the agreement. Morales’ contractual responsibility to a carrier went beyond transmitting the funds actually received, to paying the price of tickets sold whether it received that amount or not. Morales, moreover, was required to transmit the proceeds not upon receipt, nor even upon demand, but at specified regular intervals. Thus for everyday purposes the relationship was the conventional one of debtor-creditor — the “trust” was a draftsman’s concept, designed to rescue Eastern in a situation such as the present but otherwise to be ignored.
 

 We find this case to be very similar to the case of
 
 Lord’s, Inc. v. Maley,
 
 356 F.2d 456 (7th Cir. 1966), in which the Seventh Circuit affirmed the bankruptcy court’s denial of a reclamation petition by the lessee of space in the bankrupt’s department store who sought to reclaim funds collected by the bankrupt through the sale of the lessee’s goods. Despite express language in the contract purporting to create a trust relationship, the court relied on such factors as the bankrupt’s freedom to use the funds between settlement dates and to commingle them with its own funds, to find a debtor-creditor relationship. The
 
 Lord's
 
 case was followed by the Tenth Circuit in
 
 Carlson, Inc. v. Commercial Discount Corp.,
 
 382 F.2d 903 (1967).
 
 See also In the Matter of the Yaeger Co., Mendel v. Whitmer,
 
 315 F.2d 864 (6th Cir. 1963);
 
 In re Martin’s,
 
 11 F.Supp. 99 (E.D.N.Y.1935).
 

 Harvey Brokerage Co. v. Ambassador Hotel Corp.,
 
 57 F.2d 727 (S.D.N.Y.1932), which Eastern cites to support its argument for a trust, actually supports our conclusion. In that case involving bankruptcy, the court presumed that a trust relationship existed where the bankrupt collected debts on behalf of another; but the court observed that the presumption could be rebutted by a showing of circumstances in the relationship inconsistent with a trust, such as the bankrupt’s right to use the funds and commingle them with its own.
 

 The conclusion we reach is not shaken by Eastern’s citation of Article 1233 of the Civil Code of Puerto Rico, Title 31 L.P. R.A. 3471, which requires that the literal sense of a contract be observed where the terms of the contract are clear and leave no doubt as to the intention of the parties. Article 1233 is similar to the prevalent common law rule.
 
 See, e. g.
 
 3 Corbin, Contracts § 573, on the Parol Evidence Rule. Neither Puerto Rico’s Code provision nor the common law rule, however, make the effect of a contract dependent solely upon the parties’ legal labels, nor do they relieve a court from the duty to examine the contract as a whole. 3 Corbin, Contracts § 549. Moreover, the principle embodied in Article 1233 has little to do with the problem at hand. Article 1233 relates to whether the parties’ intent is to be sought within or without the language of an agreement, whereas the present problem is to determine, in a bankruptcy setting where third-party interests are very much at stake, the legal consequences that flow from a prior contractual arrangement. If a ritualistic incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests.
 

 Nor are we persuaded by Eastern’s citation of three lower state court cases involving travel agency contracts. In
 
 Air Traffic v. Downtown Travel Center,
 
 87 Misc.2d 151, 383 N.Y.S.2d 805 (N.Y. Supreme Ct. 1976), and
 
 Pan American v. Lev Art Travel,
 
 an
 
 *1073
 
 unpublished California case described in
 
 Air
 
 Traffic,
 
 [5]
 
 the contracts required the agencies to keep the proceeds of ticket sales in separate accounts. As we have indicated
 
 supra,
 
 such a requirement, whether in practice met or not, would go some distance toward establishing a legally effective trust, although we do not here consider whether such a requirement would by itself accomplish this for bankruptcy purposes.
 
 [6]
 

 Rappa v. American Airlines,
 
 87 Misc.2d 759, 386 N.Y.S.2d 612 (Civil Ct. of the City of New York 1976), appears to involve a like contract with the same separate account requirement. Furthermore, that case decided only that the airline was liable to refund the amount of a ticket to the purchaser despite the agent’s insolvency. The court there did cite
 
 Air Traffic’s
 
 reference to a trust relationship between the airline and the agent, but the result in
 
 Rappa
 
 follows from the contractual provisions of the ticket itself, regardless of the relationship between airline and agent.
 

 We need not conclusively rule that the relation here is, for all purposes, one of debtor/creditor, however, for our holding would be the same even were we to find that the relation was intended to be one of principal/agent or consignor/consignee. In either such relationship, a principal or consignor who allows property to appear that of the agent’s or consignee’s estate will in the event of the latter’s bankruptcy be estopped from recovering that property from the trustee,
 
 see
 
 3 Remington on Bankruptcy § 1212.02, at 52-53 (Henderson ed. 1957), and cases cited therein;
 
 cf.
 
 4 Collier on Bankruptcy § 541.08(2), at 541-39 (15th ed.); 4A Collier on Bankruptcy § 70.-18, at 202 (14th ed.), and Eastern’s failure to require segregation or restricted use of its funds has clearly served to create such an appearance here. Of course, no other questions relating to the nature of the airline/travel agency relationship are before us in this case, and our opinion intimates no view as to any such question. Because of our conclusion on this issue, it is not strictly necessary to consider the question of tracing. We discuss the matter, however, because the impossibility of tracing in this case demonstrates the injustice that-would result from allowing Eastern to recover.
 

 Eastern cites several cases involving consignment arrangements in which the consignor was permitted to retrieve its property upon bankruptcy of the consignee. None of these cases is helpful to Eastern here, since in each case the consigned goods were readily identifiable.
 
 See, e. g., Ludvigh v. American Woolen,
 
 231 U.S. 522, 34 S.Ct. 161, 58 L.Ed. 345 (1913);
 
 In re DIA Sales Corp., Ray v. Maguire,
 
 339 F.2d 175 (6th Cir. 1964);
 
 Fowler v. Pennsylvania Tire,
 
 326 F.2d 526 (5th Cir. 1964). Where the consigned goods have been sold, the consignor has been allowed to recover the proceeds only where they could be traced.
 
 See, e. g., In re Midwest Gas,
 
 174 F.Supp. 618 (W.D.Mo.1959).
 

 Eastern argues that the requirement of tracing does not apply here because the proceeds of its tickets could not have been commingled with Morales’ own funds, since Morales had no income other than the proceeds of ticket sales. This argument seems to be directed toward excluding non-airline creditors from any distribution of Morales’ assets. We reject both the factual premise and the legal conclusion.
 

 It appears to be true that Morales’ business consisted entirely of ticket sales, the proceeds of which would, if we were to give effect to the “trust” language of the IATA Agreement, all belong to the airlines until the time of settlement. But it does not follow that all of Morales’ assets derive from the .proceeds of ticket sales. The claims against Morales’ estate demonstrate that Morales received some $48,500 in bank
 
 *1074
 
 loans, as well as $1,250 worth of office materials bought on credit. In addition, Morales must have retained a commission on each past occasion when it settled the account with an airline. We have no reason to believe that Morales’ current assets do not derive at least in part from these sources, which have been commingled with the proceeds of ticket sales. Furthermore, although commingling usually does refer to a mixing with the debtor’s own funds, the doctrine of tracing requires the claimant to identify the property he seeks as his own, not just to exclude the possibility that it belongs to the debtor.
 
 See generally Sonnenschein v. Reliance Insurance Co.,
 
 353 F.2d 935 (2d Cir. 1965);
 
 Gulf Petroleum S.A. v. Collazo,
 
 316 F.2d 257 (1st Cir. 1963); 4A Collier, Bankruptcy ¶ 70.25[2], at 354 (14th ed. 1964). Eastern is unable to do so here. The non-airline creditors, as-well as the other airlines, are therefore entitled to receive their fair share of Morales’ assets through distribution in bankruptcy.
 

 Affirmed.
 

 [1]
 

 . The summary of property lists $100 in real property.
 

 [2]
 

 .The bankruptcy court awarded judgment for Eastern in the amount of $9,700.99, representing the proceeds of ticket sales made since filing of the petition for bankruptcy. That judgment is not challenged here.
 

 [3]
 

 . In this court, the trustee in bankruptcy waived his right to file a brief and to participate in oral argument.
 

 [4]
 

 . As the district court observed initially, the trust language may be viewed as an effort to create a security interest in the ticket proceeds for the benefit of the airlines. Since Eastern
 
 *1072
 
 has not asserted any claim to a security interest as such, we need not consider whether this contract could, under Puerto Rico law, be effective in the creation of such an interest. Quite possibly, although we do not purport to rule, Puerto Rico law may prohibit security interests in such property as the proceeds of future sales. See-P.R.Code Ann. Title 30 §§ 204(1) and (5). The IATA Agreement makes applicable the law of the principal place of business of the agent.
 

 [5]
 

 . Our knowledge of the unpublished
 
 Pan American
 
 case derives solely from the discussion of it in the
 
 Air Traffic
 
 decision.
 

 [6]
 

 . Neither of these cases involved bankruptcy of the travel agency.