In re PROPERTY LEASING & MANAGEMENT, INC., Debtor.

Douglas WICKHAM, Trustee, Plaintiff,

v.

UNITED AMERICAN BANK, First Tennessee Bank, Knoxville, Tennessee, and The Federal Deposit Insurance Corporation, Defendants,

and

United American Bank of Memphis (formerly Central Trade Bank of Memphis and United American Bank in Memphis), Intervening Defendant.

FIRST TENNESSEE BANK, Knoxville, Tennessee, Counterclaimant,

v.

Douglas WICKHAM, Trustee, Counterdefendant.

UNITED AMERICAN BANK OF MEMPHIS (formerly Central Trade Bank of Memphis and United American Bank of Memphis), Counterclaimant,

v.

Douglas WICKHAM, Trustee, Counterdefendant.

UNITED AMERICAN BANK OF MEMPHIS (formerly Central Trade Bank of Memphis and United American Bank of Memphis), Cross-claimant,

v.

FIRST TENNESSEE BANK, Knoxville, Tennessee, and The Federal Deposit Insurance Corporation, Cross-defendants.

Bankruptcy No. 3–82–01397.
Adv. No. 3–82–1025.

United States Bankruptcy Court,
E.D. Tennessee.

May 23, 1985.

Bass, Berry & Sims, L. Wearen Hughes, Wallace W. Dietz, Nashville, Tenn., for plaintiff-trustee.

Bernstein, Susano, Stair & Cohen, Doris C. Allen, Knoxville, Tenn., for First Tennessee Bank, Knoxville, Tenn.

Morton, Lewis, King & Krieg, Deborah C. Stevens, Knoxville, Tenn., for Federal Deposit Ins. Corp.

Baker, Worthington, Crossley, Stansberry & Woolf, James E. Drinnon, Knoxville, Tenn., for United American Bank of Memphis.

## MEMORANDUM UPON PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether under certain property management agreements the debtor was a trustee or simply a debtor with respect to funds collected on behalf of property owners who entered into the agreements with the debtor.

### I

On March 7, 1985, this court entered a final judgment in this action to avoid preferential transfers under 11 U.S.C.A. § 547 (West 1979) and to determine a right of setoff under 11 U.S.C.A. § 553 (West 1979). Subsequently, the plaintiff trustee filed a motion to alter or amend the judgment. Pursuant to plaintiff's motion this court entered an order requiring the parties to submit additional stipulated information and briefs of law to enable the court to adequately address plaintiff's motion. The parties have complied with that order, and the stipulations are before the court.

Plaintiff's motion to amend the judgment concerns property management agreements between the debtor Property Leasing and Management, Inc. and certain property owners. PLM was in the business of acting as rental agent for private homeowners and owners of local campgrounds in the rental of temporary accommodations to visitors to the 1982 World's Fair in Knoxville, Tennessee. As noted in this court's previous memorandum, PLM's management agreements with the property owners varied in form, specifically regarding PLM's duties respecting funds collected on behalf of the property owners.

In its previous memorandum this court considered the provisions of one such agreement which the parties had stipulated as the "standard contract" between PLM and the majority (but not all) of the property owners. Ex. 4, ¶ 6. *See* Ex. 4–M. The court concluded that "those management agreements containing provisions such as paragraph 5 of Ex. 4–M established a trust fund for the benefit of property owners who were party to such agreements with PLM."[1] *Douglas Wickham, Trustee v. United American Bank et al. (In re Property Leasing & Management, Inc.),* 46 B.R. 903, 907 (Bankr.E.D.Tenn.1985).

However, in his motion to amend the judgment plaintiff subsequently indicated that the parties were unable to agree as to which of the various other management agreements contained "provisions such as paragraph 5 of Ex. 4–M."

In their post-judgment stipulations the parties have since agreed that eight additional property owners entered into management agreements with PLM sufficiently similar to paragraph 5 of Ex. 4–M to come within the purview of the court's previous holding.[2] Post-Judgment Stipula-

---

1. Paragraph 5 of Ex. 4–M provides:

   5. All monies furnished by Owner as working funds and all monies received by Agent for or on behalf of Owner shall be deposited by Agent in a commercial bank and shall not be comingled [sic] with the funds of Agent. Such funds shall be disbursed by Agent in such amounts and at such times as the same are required to pay for obligations, liabilities, costs, expenses and fees (including, without limitation, the compensation of Agent as hereinafter provided) arising on account of or in connection with this Agreement. All amounts remaining after the payment of expenses and fees, shall be paid over to Owner monthly. Owner shall reimburse Agent promptly for any monies which Agent may elect to advance for the account of Owner. Nothing herein contained, however, shall be construed to obligate Agent to make any such advances.

2. In examining the relevant provisions of these management agreements the court finds that they are either identical to paragraph 5 of Ex.

tions, ¶ 1 (April 22, 1985). In addition, the parties have stipulated that nine management agreements do not contain language similar enough to paragraph 5 of Ex. 4–M to come within the purview of the court's previous holding.[3] Post-Judgment Stipulations, ¶ 2.

The parties are, however, unable to agree on the effect of the provisions contained in two remaining groups of management agreements.

The first group in question consists of nineteen agreements containing the following provision:

> All reservation deposits received by Leasing pursuant to the provisions of paragraph 7 above shall be retained by Leasing in an escrow account until such time as such monies shall become non-refundable in accordance with the policy established by Campground, at which

4–M or that they have such very minor differences as to be indisputably inconsequential.

3. Although the court does not have before it copies of two of the agreements, the remaining seven agreements contain one of the following provisions:

(1) All monies received by Leasing for or on behalf of Owner shall be deposited by Leasing in a commercial bank. Such funds shall be disbursed by Agent in such amounts and at such times as the same are required to pay for obligations, liabilities, costs, expenses and fees including, without limitation, the compensation of Leasing hereinafter provided, arising on account of or in connection with this Agreement. All amounts remaining after the payment of expenses and fees shall be paid over to Owner monthly by the tenth (10th) of the following occupied month.

(2) Agent shall render to Owner a monthly account of all receipts, disbursements and expenses incurred by Agent with regard to the renting of the Rooms for cleaning and credit card discount and Agent fee and shall remit to Owner all monies received by Agent from the rental of the Rooms, after deducting therefrom disbursements made by Agent from the rental of the Rooms, after deducting therefrom disbursements made by Agent in connection with these rentals and Agent's commission, as hereinafter specified.

(3) All monies received by Agent for, or on behalf of Owner shall be delivered by Agent to Owner on a monthly basis.

(4) All monies received by Agent for, or on behalf of Owner shall be deposited by Agent in a commercial bank. Such funds shall be disbursed by Agent in such amounts and at

time, Leasing shall remit all such monies to Campground, after deducting therefrom the fees, commissions and other charges due to Leasing hereunder. It is hereby expressly agreed that if Campground shall be guilty of any breach hereof or of any default hereunder, Leasing shall have the right of set-off against any such escrowed funds for the purpose of compensating Leasing and/or any other parties entitled thereto for any losses or damages suffered by them as the result of any such breach or default by Campground.[4]

Post-Judgment Stipulations, ¶ 4.

The second group in question consists of two management agreements containing the following relevant language:

> Beginning in December, 1981, a monthly accounting of all monies received by Leasing for Campground reservations on

such times as the same are required to pay for obligations, liabilities, costs, expenses and fees included without limitation, the compensation of Agent hereinafter provided, arising on account of, or in connection with this Agreement. All amounts remaining after the payment of expenses and fees, shall be paid over to Owner monthly [or bi-monthly].

Upon reviewing these provisions the court is persuaded that under the analysis set forth both in original memorandum and herein such provisions are insufficient to establish a trust fund for the benefit of property owners who were party to these agreements.

4. In addition, Exhibit C to each of these agreements provides:

Beginning November 30, 1981 a monthly accounting of all monies received for campground reservations will be submitted to campground owners no later than the 10th of the following month in the form of a computer print-out. The specified monies will be held in escrow account and can be retrieved by campground owner upon submission to Property Leasing & Management Supplemental Lodging Division of a letter of credit in the amount of monies requested. Property Leasing & Management will submitt [sic] to campground owners these monies within three days after letter of credit, or verification of same is received.

After the November 30th accounting, accounting on the basis of the above system will be submitted to the owners once a month no later than the 10th of the following month.

Post-Judgment Stipulations, ¶ 4.

Campground's campsites will be submitted to Campground, and after said December accounting, a similar updated accounting will be submitted to Campground once a month no later than the 10th of each following month. Said accounting shall be in the form of a computer printout reflecting the classification of the campsites reserved and all monies received thereon. Leasing shall remit to Campground, as often as monthly, beginning December, 1981, and subject to the terms and conditions hereinafter stated, all monies Leasing holds for reservation of Campground's sites during the entire term of this contract. Said monies will be held in an escrow account by Leasing until Campground submits to Property Leasing & Management's Supplemental Lodging Division proof of Campground's financial responsibility for the monies which are still subject to refund under Campground's cancellation policy. Campground may prove its financial responsibility for said monies by submission [sic] to Leasing a letter of credit from a recognized bank or lending institution. Before Leasing remits any money to Campground, Leasing shall deduct therefrom the commissions due Leasing under this contract. It is further expressly agreed that if Campground shall be guilty of any breach hereof or any default hereunder, Leasing shall have the right of setoff against any escrow funds for the purpose of compensating Leasing and/or any other parties

entitled thereto for any losses or damages suffered by them as a result of any such breach or default by Campground.

Leasing shall remit to Campground said monies which are still subject to refund under Campground's cancellation policy, within seven (7) days of Campground's submission of the letter of credit showing Campground's financial responsibility for same. Said monies held in escrow which are no longer subject to refund by the terms of said cancellation policy shall be remitted by Leasing to Campground within seven (7) days of request and a letter of credit covering said non-refundable monies shall not be necessary.[5]

Post-Judgment Stipulations, ¶ 5.

## II

The determinative question is whether under these two types of agreement PLM was a trustee or simply a debtor of the property owners with respect to the funds collected.

Where money is paid to one for the use of another ... it is sometimes difficult to distinguish trust from debt. It is often held that such persons as commission agents receiving the proceeds of goods sold, insurance agents collecting premiums, an agent to sell bonds, and a collector of rents are trustees of the money so coming into their hands, when the expectation of the parties is that the agent will keep separate the cash or credit he re-

---

**5.** These agreements also contain the following provision regarding costs, expenses, liabilities, etc. arising in connection with the agreement:

Campground does hereby agree to indemnify Leasing and to hold Leasing harmless from any and all claims, demands, liabilities and/or causes of action of any nature whatsoever, including without limitation, costs, expenses and attorney's fees incurred by Leasing in connection therewith, arising out of or in connection with or in any manner related to this agreement, or the rental of campsites or in the operation of the campground facilities of Campground, except for such claims, demands, liabilities and/or causes of action as shall directly and proximately arise out of or result from the negligence of or a default hereunder by Leasing. Further, Leasing does

hereby agree to indemnify Campground against and to hold Campground harmless from any and all claims, demands, liabilities and/or causes of action of any nature whatsoever, including, without limitation, costs, expenses and attorney's fees incurred by Campground in connection therewith, arising out of in connection with or in any manner related to this agreement or the reservation of campsites by Leasing through or as a result of Leasing's reservation system, except for such claims, demands, liabilities and/or causes of action as shall directly and proximately arise out of or as a result from the negligence of a default hereunder by Campground.

Collective Ex. 9 (Agreement with West Haven Trailer Park, ¶ 8).

ceives, earmark it as that of his principal, and remit it to his principal. But if he is at liberty to use the proceeds as his own in return for a contract obligation to pay some money to the principal, debt is the normal relationship.

G.G. Bogert & G.T. Bogert, *Handbook of the Law of Trusts* 82 (5th ed. 1973) (footnotes omitted).

[I]t depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created.

Restatement (Second) of Trusts § 12 comment g (1959).

In *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir.1981) the plaintiff airline argued that proceeds of sales of the airline's tickets by the debtor travel agency were held in trust by the debtor. The airline relied upon a resolution under the International Air Transport Association Passenger Sales Agency Agreement providing that proceeds of ticket sales " 'shall be the property of the Carrier and shall be held by the Agent in trust for the Carrier or on behalf of the Carrier, until satisfactorily accounted for to the Carrier and settlement made.' " *Morales*, 667 F.2d at 1070. The court rejected the airline's contention, observing:

The terms of the IATA Agreement and Resolutions were inadequate, in our view, to give rise to a trust upon the proceeds from tickets sold by Morales to its customers. To be sure, Resolution 820(a) recited, in general terms, that the agent was to hold whatever monies it collected in trust for the carrier until accounted for, and that these monies were the carrier's property until settlement occurred. However, talismanic language could not throw a protective man-

tle over these receipts *in the absence of a genuine trust mechanism.* Here the relationship remained in practical fact that of debtor-creditor. The contract *nowhere required Morales to keep the proceeds of Eastern's ticket sales separate from any other funds,* whether Morales' own funds or the proceeds of other airlines' ticket sales. *Nor was any specific restriction placed upon Morales' use of the supposed trust funds.* Morales was left free to use what it received for its own benefit rather than Eastern's, and to transform the receipts into assets with no apparent encumbrance, upon which potential creditors might rely. The use of the word "trust" and the designation of the airline as titleholder, in a contract which is not publicly filed, would not save potential creditors from relying on such assets as ... a bank account solely in the name of the agency. In the absence of any provision requiring Morales to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label "trust" could in these circumstances and for present purposes have no legal effect.

*Morales,* 667 F.2d at 1071.

The obvious concern at the heart of *Morales* and similar holdings is to prevent parties in an essentially debtor-creditor relationship from invoking talismanic phraseology—in a complete absence of genuine trust elements and obligations—solely as a means of protecting or securing the payment of a debt.

*See Pan American World Airways v. Shulman Transport Enterprises,* 21 B.R. 548 (Bankr.S.D.N.Y.1982) (where no requirement of segregation of funds and no indication of debtor's intent to assume fiduciary duties for benefit of carrier, real purpose of agency agreement was not to create trust but only to secure payment regardless of debtor's solvency), *aff'd,* 33 B.R. 383 (S.D.N.Y.1983), *aff'd,* 744 F.2d 293 (2d Cir.1984). *See also Lord's, Inc. v. Maley,* 356 F.2d 456, 459 (7th Cir.1965) ("it appears that in the case before us, a 'trust' clause has been inserted into a document

which otherwise sets up a simple debtor-creditor relationship in an effort to assure the debtor's performance of its obligation and not to create a trust"), *cert. denied* 385 U.S. 847, 87 S.Ct. 55, 17 L.Ed.2d 78 (1966).

■ It is, however, a different matter where the provisions of the agreement are more than mere verbal window dressing and manifest the parties' intention that the agent undertake genuine equitable obligations to deal with the funds for the benefit of another party. Both of the agreements here in question required PLM to segregate the funds collected in an escrow account. Both agreements explicitly called for retention of these specific funds in the escrow account until either (1) the property owner submitted proof of financial responsibility (e.g. a letter of credit) in order to receive reservations deposits which were not yet nonrefundable or (2) the reservations deposits had become nonrefundable. Upon the occurrence of either of these conditions PLM was required to remit these funds (minus authorized deductions) to the property owner within the time frame provided.

Clearly, the parties did not contemplate by the terms of these agreements that the funds collected were to go into PLM's general account to be subject to its unrestricted use in the general course of its business. The funds were to be segregated in the escrow account and were to remain there until the occurrence of either of the requisite conditions rendered appropriate the remittance of the proceeds to the property owners. Unlike the situation considered in *Morales,* had PLM abided by the terms of the agreements here it would not have been "free to use what it received for its own benefit ... and to transform the receipts into assets with no apparent encumbrance, upon which potential creditors might rely." *Morales,* 667 F.2d at 1071.

Consequently, this court is persuaded that the two types of management agreements here in question manifested the parties' intentions that PLM undertake genuine trust obligations with respect to specific funds. This was not merely a contractual debt obligation leaving PLM unrestricted liberty to use the funds as its own. These agreements sufficiently established a trust fund for the benefit of those property owners who were party to such agreements.

■ The court need not here reiterate the findings underlying its conclusion that UABK (and its successor in interest, First Tennessee) may be charged with knowledge of the trust character of the funds, precluding setoff with regard to such funds. *See Douglas Wickham, Trustee v. United American Bank et al.* 46 B.R. at 908–909. For the reasons there set forth First Tennessee is entitled to a right of setoff with respect to the funds previously constituting funds in PLM's checking account 03–6268–5 only to the extent, if any, that the said funds exceed the allowed claims of any claimants in the debtor's bankruptcy case under any PLM management agreements addressed by the court herein, with the exception of those designated in paragraph 2 of the parties' Post-Judgment Stipulations. *See supra* note 3 and accompanying text.

In accordance with Bankruptcy Rule 7052 and Fed.R.Civ.P. 52(b) this memorandum constitutes additional findings of fact and conclusions of law.