949 F.2d 178
 In re SAKOWITZ, INC. Sakowitz, Inc. of Amarillo, Sakowitz,
Inc. of Arizona, Sakowitz-Gulfgate, Inc., and
Sakowitz of Oklahoma, Inc., Debtors.
EVANS FUR COMPANY OF HOUSTON, INC., Appellant,
v.
The CHASE MANHATTAN BANK, N.A., InterFirst Bank Dallas, N.A.
First Pennsylvania Bank, N.A., Security Pacific
National Bank, and Amarillo National
Bank, Appellees.
 No. 90-6023.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 26, 1991.
 
 Joanne M. Vorpahl, Warren W. Harris, Porter & Clements, Houston, Tex., Samuel B. Garber, VP, Gen. Counsel, Evans, Inc., Chicago, Ill., for Evans Fur Co. of Houston, Inc.
 Mary M. Gregory, Baker & Botts, Houston, Tex., Howard C. Buschman, III, Stephen J. Shimshak, Laurie R. Binder, Milbank, Tweed, Hadley & McCloy, New York City, Alex T. Galbraith, Hoffman & Assoc., Houston, Tex., for Chase Manhattan Bank, N.A., et al.
 Michael J. Durrschmidt, Hirsch & Westheimer, Houston, Tex., for other interested parties.
 Appeals from the United States District Court for the Southern District of Texas.
 Before REYNALDO G. GARZA, WIENER and BARKSDALE, Circuit Judges.
 REYNALDO G. GARZA, Circuit Judge:
 
 
 1
 In this case we determine title to escrowed funds containing proceeds collected by bankrupt stores for sales on special credit accounts. We hold that the district court correctly affirmed the bankruptcy court's decision that these funds were not subject to either an express or implied trust in favor of the merchant who owned and sold the merchandise, but rather were subject to the Appellee-Banks' security interest.
 
 PROCEDURAL HISTORY
 
 2
 This appeal arises out of an adversary proceeding in the bankruptcy of Sakowitz, Inc., Sakowitz, Inc. of Amarillo, Sakowitz, Inc. of Arizona, Sakowitz-Gulfgate, Inc., and Sakowitz of Oklahoma, Inc. (collectively "Sakowitz"). On November 18, 1985, The Chase Manhattan Bank, N.A., InterFirst Bank Dallas, N.A., First Pennsylvania Bank, N.A., Security Pacific National Bank, and Amarillo National Bank (collectively "the Banks") filed an adversary proceeding against Sakowitz and Evans Fur Company of Houston, Inc. ("Evans"), claiming title to certain escrowed funds as accounts receivable of Sakowitz. On February 9, 1987, the Banks filed their motion for summary judgment against Sakowitz and Evans. On August 12, 1987, the bankruptcy court entered an order granting the Banks' motion for summary judgment and awarding the Banks the escrowed funds.
 
 
 3
 Evans timely perfected an appeal to the district court which affirmed the bankruptcy court's order. Evans timely filed its notice of appeal to this Court on December 5, 1990. This Court has jurisdiction over this appeal under 28 U.S.C. § 158(d) (1988).
 
 FACTS
 
 4
 Before August 1, 1985, the date upon which Sakowitz petitioned for bankruptcy ("the Petition Date"), Sakowitz owned and operated department stores in the Southwest. Before the Petition Date, the Banks financed Sakowitz's operations, in consideration of which Sakowitz granted the Banks a valid and perfected security interest in accounts receivable and their proceeds.
 
 
 5
 Evans, a fur merchandiser, sold furs in Sakowitz stores pursuant to a sublease agreement dated July 1, 1980. The fur departments in the various Sakowitz stores were staffed and operated exclusively by Evans employees, who sold furs directly to customers and turned over cash and credit receipts to Sakowitz each day. All of the fur inventory belonged to Evans. Nevertheless, under the sublease the Evans fur departments were to be, to all appearances, Sakowitz departments. There was no indication that the furs were being sold by anyone other than Sakowitz. Evans used Sakowitz boxes, wrapping and stationary, and was permitted to advertise only under Sakowitz's name.
 
 The sublease provided that
 
 6
 [a]ll monies received from customers through the sale of [Evans'] merchandise or any services offered by [Evans] shall be paid at the time of receipt to the cashier of [Sakowitz], who shall keep a full true and accurate record thereof ...
 
 
 7
 . . . . .
 
 
 8
 The amount of rent shall be computed at the time of each monthly accounting, and shall then be deducted from the amount in the hands of [Sakowitz] belonging to [Evans]. The balance of such amount, less all deductions contemplated by this Sublease, shall be and remain the property of [Evans] and shall be remitted by [Sakowitz] to [Evans] ... As to funds which shall remain the property of [Evans] under the terms of this Article XV hereof, it is specifically understood and agreed that while the same are in the hands of [Sakowitz] they shall be held by [Sakowitz], in trust, for [Evans] and shall be so identified on [Sakowitz's] records.
 
 
 9
 According to the sublease, customers were permitted to purchase Evans' furs on credit extended by Sakowitz so long as the customer first received Sakowitz's approval for the credit sale. Sakowitz had various credit arrangements that could be used by such customers, including credit card sales, C.O.D. sales, lay-away sales and, particularly significant for this case, "special account" sales.
 
 
 10
 By the twentieth of every month, Sakowitz was obligated to pay Evans for "all sales made by [Evans] from the demised premises during the preceding calendar month," less rental payments due Sakowitz for Evans' use of its premises. Significantly for this case, the sublease reads:
 
 
 11
 Where any such sale may have been made on credit and so approved, the amount of such credit sale shall be included in the monthly settlements between [Sakowitz and Evans] ... and shall be included in the balance to be remitted by [Sakowitz to Evans] whether such credit sale has been, in fact, collected or not.
 
 
 12
 . . . . .
 
 
 13
 Where merchandise is sold by [Evans] on the C.O.D. or lay-away plan, if said transaction is handled in conformity with [Sakowitz's] rules pertaining to its own business, Evans shall be given full credit for the entire amount of such sale ... where a sale is made on the special account or lay-away plan and ... in the event any customer payments become delinquent pursuant to the customer's agreement made with [Sakowitz] at the time of sale, then [Sakowitz] shall remit to [Evans] the amount of such delinquencies.
 
 
 14
 [Emphasis added].
 
 
 15
 The sublease provided that "to the extent funds of [Evans] may be on hand with Sakowitz, [Sakowitz] shall advance for [Evans'] account the amount of all wages and salaries (less all payroll deductions ...) for [Evans'] department employees and shall pay such amounts, on [Evans'] behalf, to such employees on the regular payroll on which [Sakowitz] makes payroll payments to its own employees ..." Similarly, the sublease provided that Sakowitz would "disburse on written order of [Evans] or its properly appointed representatives, out of the funds of [Evans] on hand with [Sakowitz] all proper and legitimate expenses necessary for the conduct of the business of [Evans] ..."
 
 
 16
 Evans sold furs to approved customers primarily by way of the aforementioned "special accounts" which allowed these customers to make monthly payments, with the remainder of the purchase price after the initial downpayment amortized interest free over what was usually a twelve month period. With respect to sales on these special accounts, the sublease provided that "it is specifically understood and agreed that such will be collected by [Sakowitz], in trust for [Evans], and shall be so identified on [Sakowitz's] records ...". Nevertheless, Evans would eventually receive full credit for every sale it made, irrespective of whether Sakowitz was able to collect from the buyers.
 
 
 17
 Sakowitz did not segregate proceeds from credit accounts from sales made by Evans. Rather, Sakowitz deposited its collections from Evans sales into its general funds accounts. Sakowitz paid Evans, other lessees and its other creditors out of the same general corporate accounts.
 
 
 18
 Sakowitz filed for Chapter 11 relief on the Petition Date. Since September 6, 1985, the money collected by the debtors representing special account sales made by Evans prior to the Petition Date has been placed in an escrow account which exceeded $2 million as of the date of the bankruptcy court's decision.
 
 ANALYSIS
 
 19
 Evans calls upon us to determine whether the district court erred in affirming the bankruptcy court's judgment that the litigants presented no genuine issues of material fact, that the sublease created no express or implied trust and that the relationship between Sakowitz and Evans was therefore one of debtor-creditor, and that the escrowed funds therefore come under the Banks' perfected security interest. For the reasons outlined below, we affirm.
 
 
 20
 I. Evans Presented No Genuine Issue of Material Fact to the Bankruptcy Court.
 
 
 21
 Evans argues that the bankruptcy court erred in granting the Banks' motion for summary judgment, claiming that fact issues exist regarding industry practice and the intention of Evans and Sakowitz in drafting the sublease. Consequently, Evans maintains that this action must be reversed and remanded to the bankruptcy court for trial. To withstand a motion for summary judgment, the nonmoving party must show that there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). It is up to the nonmoving party to "designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Evans made no such designations in its reply to the Banks' summary judgment motion to the bankruptcy court. At no time during the proceedings at the bankruptcy court level did Evans claim that issues existed which required factfinding proceedings.[1] As we have previously stated,
 
 
 22
 [i]t is almost axiomatic that any genuine issues of fact must somehow be shown to exist at the [lower] court level. Where the moving papers do not reveal the presence of a factual controversy and the opposing party manifests silent assent through inaction, the opposing party will not thereafter on appeal be heard to belatedly assert as grounds for reversal that some factual disputes implicit in the underlying arguments have yet to be resolved.
 
 
 23
 Franz Chemical Corp. v. Philadelphia Quartz Company, 594 F.2d 146, 150 (5th Cir.1979). The Court does note, however, that the intent of the parties to create a trust is immaterial if, in a bankruptcy setting with the rights of creditors at stake, the sublease, negotiated by sophisticated parties, failed to establish a trust mechanism. See In re Morales Travel Agency, 667 F.2d 1069, 1072 (1st Cir.1981). For the reasons stated below, we conclude that the sublease did not create a trust mechanism.
 
 
 24
 II. The Sublease did not Create an Express Trust.
 
 
 25
 Evans seeks to show that Sakowitz held the proceeds of special account sales made by Evans in trust. If Evans could succeed, then the escrowed funds would not be subject to the Banks' security interest because property held in trust for another is not property of the estate under 11 U.S.C. § 541 in the event of the trustee's bankruptcy. See Begier v. I.R.S., 496 U.S. 53, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). Evans concedes that the words "held ... in trust" in the sublease do not in and of themselves suffice to establish an express trust. It is well established that "[i]f a ritualistic incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests." Morales, 667 F.2d at 1072. In Morales, a bankrupt travel agency had been in the business of selling airline tickets to the public. The contract which governed the agency's relationship with the airlines provided that said airlines would provide blank tickets to the agency which remained the property of the airlines until sold to the public. Under the contract, whatever money the agency collected would "be the property of the Carrier and [would] be held by the Agent in trust for the Carrier or on behalf of the Carrier, until satisfactorily accounted for to the Carrier and settlement made." Id. at 1070 (quoting the agreement). As in this case, however, the contract did not explicitly prohibit commingling of funds, and commingling did in fact occur. After the travel agency was adjudicated bankrupt, Eastern AirLines sued to recover a substantial sum which it claimed was not part of the bankruptcy estate according to 11 U.S.C. § 541, but was rather trust property. In ultimately affirming the decision of the bankruptcy court, the First Circuit stated:
 
 
 26
 The terms of the [contract] were inadequate, in our view, to give rise to a trust upon the proceeds from tickets sold by Morales to its customers. To be sure, [the contract] recited, in general terms, that the agent was to hold whatever monies it collected in trust for the carrier until accounted for, and that these monies were the carrier's property until settlement occurred. However, talismanic language could not throw a protective mantle over these receipts in the absence of a genuine trust mechanism. Here the relationship remained in practical fact that of debtor-creditor. The contract nowhere required Morales to keep the proceeds of Eastern's ticket sales separate from any other funds, ... The use of the word "trust" and the designation of the airline as titleholder, in a contract which is not publicly filed, would not save potential creditors from relying on such assets as office equipment, accounts receivable, and a bank account solely in the name of the agency. In the absence of any provision requiring Morales to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label "trust" could in these circumstances and for present purposes have no legal effect.
 
 
 27
 Id. at 1071.
 
 
 28
 Evans contends that the requirement to account for Evans' property separately from Sakowitz's property was in fact a segregation requirement, but we cannot read the language of the sublease that way. Moreover, Evans argues that as trustee, Sakowitz had a duty not to commingle the funds, and that Evans should not be penalized for Sakowitz having failed to fulfill its duties as trustee. This argument is circular. Clearly, if the contract under consideration were facially a trust agreement it would need no provision prohibiting commingling of trust funds with those of the trustee. Commingling is prohibited by the common law and virtually every trust code or trust law, so an express prohibition of commingling would be redundant. But the contract under consideration here is not facially a trust agreement; facially it is a sublease. Evans asks us to make a silk purse out of a sow's ear by finding that a contract of sublease creates an express trust. To succeed, Evans must point to provisions in the sublease that would be consistent with an express trust. There are any number of provisions that, although they would be redundant in a contract that on its face is a trust agreement, would facilitate an effort to find a trust in a contract that is not facially a trust agreement. Among any number of trust-like provisions that could be but are not present in the instant sublease--and that would tend to support the finding of an express trust--would be a provision prohibiting commingling of trust funds. Sakowitz had a duty not to commingle the funds only if it was in fact a trustee, and the contract before us is insufficient to create a trust mechanism.
 
 
 29
 We find that the facts of Morales are sufficiently similar to the facts presented to us to conclude that the sublease failed to create an express trust. Our finding is strengthened by the fact that the Morales court buttressed its conclusion by noting that
 
 
 30
 Morales' contractual responsibility to a carrier went beyond transmitting the funds actually received, to paying the price of tickets sold whether it received that amount or not. Morales, moreover, was required to transmit the proceeds not upon receipt, nor even upon demand, but at specified regular intervals. Thus for everyday purposes the relationship was the conventional one of debtor-creditor--the "trust" was a draftsman's concept, designed to rescue Eastern in a situation such as the present but otherwise to be ignored.
 
 
 31
 Id. at 1072.
 
 
 32
 The contract before us contained the same elements foreign to a true trust mechanism. Sakowitz did not have to turn over the proceeds until the 20th of each month, except for specific purposes which, despite Evans' arguments, we find not to be equivalent to payment on demand. Moreover, Sakowitz bore the credit risk, and had to pay Evans regardless of whether or not customers had in fact paid their bills. Otherwise stated, Sakowitz would have had to pay Evans even in the absence of a trust res. Finally, the trust language presented appears to us to be nothing more than a draftsman's ineffectual effort to "bootstrap" a bit of additional leverage for Evans as Sakowitz's sublessee.[2]
 
 
 33
 The Morales Court relied upon Carlson, Inc. v. Commercial Discount Corp., 382 F.2d 903 (10th Cir.1967). In that case, a shoeseller leased space in a department store which later went bankrupt. The contract was similar to the one before us except that it provided that the proceeds, while in the hands of the department store, would remain in trust for the shoeseller even if mingled with other funds. Id. at 904. Evans attempts to distinguish Carlson, contending that the contract in that case expressly authorized commingling. The Carlson Court's rationale, however, was that
 
 
 34
 [t]he agreement is essentially a lease agreement, and the provisions relative to the proceeds from sales in the shoe departments also create a debtor-creditor relationship between the parties to the lease. The instrument does not provide for the typical handling of assets or funds on a continuing basis. An express trust is defined by the Restatement (Second), Trusts § (1959), as a "fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." This is the common definition.
 
 
 35
 However the indicia of such a trust relationship are not present in the case at bar. There is no indication that the lessor assumed equitable duties to handle the "trust" funds for the benefit of the lessee, that is to deal with the property for the benefit of the appellant as the authorities define the relationship. The facts and circumstances instead indicate the creation of an obligation to repay a portion of the funds at stated times, ...
 
 
 36
 Id. at 904-05.
 
 
 37
 Another indicia of a debtor-creditor relationship in Carlson was that, as in the case before us, "[c]harge sales in the leased departments, it was agreed, would be assumed by the lessor-bankrupt after its approval, and all credit risks including checks tendered for cash sales would also be assumed by it." Id. at 904. As the court noted in affirming the summary judgment of the bankruptcy court in a case with a similar agreement,
 
 
 38
 commingling is not the only factor relied upon to establish the creditor-debtor relationship. Other factors of equal significance include [bankrupt's] continued liability to the carriers whether or not it actually received payment from the customers, as well as payment schedules that required [bankrupt] to pay monies to the airlines before it received payment from the customers.
 
 
 39
 Pan American World Airways, Inc. v. Continental Bank (In re Shulman Transport Enterprises, Inc.), 33 B.R. 383, 386 (D.C.S.D.N.Y.1983), aff'd, 744 F.2d 293 (2d Cir.1984).
 
 
 40
 In sum, we find that the fact that Sakowitz bore the credit risk, the fact that Evans could not get the proceeds of its sales in total on demand, combined with the lack of any express prohibition against the commingling which did in fact occur, lead to the conclusion that the sublease failed to create an express trust. We agree with the Second Circuit that, for the purposes of 11 U.S.C. § 541, "[w]here the relative rights of a bankrupt's creditors are at issue, it is particularly important that substance not give way to form." Shulman, 744 F.2d at 295.
 
 
 41
 III. The Sublease did not Create an Implied Trust.
 
 
 42
 Evans contends that even if the sublease failed to create an express trust, it nevertheless created an implied trust. Evans relies upon Firestone Tire & Rubber Co. v. Goldblatt Bros., Inc. (In re Goldblatt Bros., Inc.), 33 B.R. 1011 (D.C.N.D.Ill.1983), appeal dismissed, 758 F.2d 1248 (7th Cir.1985). That case dealt with a contract under which Firestone marketed tires and other automotive products at Goldblatt stores under Goldblatt's trade name. Unlike the contracts discussed supra, the word "trust" was not used. However, Firestone turned over cash and credit receipts to Goldblatt at the end of each business day for later return after the deduction of a royalty payment.
 
 
 43
 Goldblatt appears to have been a close case. As in the cases discussed supra, the bankruptcy court held that the contract failed to create a trust. The district court reversed, however, finding that
 
 
 44
 [t]he law presumes, when one turns over to another proceeds to be held and later returned, that the party receiving the proceeds holds them in a fiduciary capacity and may not commingle them; in other words, there is a presumption that an implied trust has been created.
 
 
 45
 Id. at 1013.
 
 
 46
 There is no indication in Goldblatt that Goldblatt bore the credit risk. Even if it did, however, we note that the Goldblatt court distinguished Morales on the basis that in the latter case, the airlines did not deposit proceeds with the travel agency. These proceeds were, rather, collected by the agency. Apparently, the Goldblatt court felt that the case before it differed sufficiently because Firestone handed over both credit receipts and cash. It appears that Goldblatt remitted the full value of the credit sales, less the royalty payment, to Firestone "within 15 working days following each four-week accounting period." Id. at 1013. The appeal before us, however, deals neither with cash proceeds collected by Evans nor with normal credit card sales, but only with the proceeds collected by Sakowitz from its special account system in which payment was generally amortized over a 12 month period. We believe that the Goldblatt court would have viewed the escrow account, the nature of which we must determine, as being more the result of a Morales type debtor-creditor relationship than one of trustee-beneficiary.
 
 
 47
 In any case, we find the characteristics of the sublease before us to be too foreign to that of a trustee-beneficiary relationship to imply a trust. We find instructive the case of Chicago Cutter-Karcher, Inc. v. Malley (In re Lord's, Inc.), 356 F.2d 456 (7th Cir.1965). This case presents a fact pattern and a lease agreement remarkably similar to that in Carlson, supra. Appellant in Lord's, contending that the agreement created a trust, asserted that the cases upon which the referee in bankruptcy, and later the district court, relied in finding that no trust had been created were inapposite because the contracts in those cases did not contain express trust provisions. The Court, however, asked rhetorically "[i]f a trust cannot be implied, is the situation materially changed by the mere use of the term 'trust' ...?" 356 F.2d at 458. We have found that the mere inclusion of the reference to an accounting and to funds being held in trust are insufficient to produce an express trust from the instant sublease agreement. When we examine the entirety of the sublease agreement, we find no other provisions consistent with a trust arrangement; all the rest are foreign to a trustee-beneficiary relationship but are consistent with a lessor-lessee relationship. With or without the two isolated, trust-like statements, the sublease agreement is no more susceptible of being construed as an implied trust than as an express trust.
 
 CONCLUSIONS
 
 48
 We hold that the sublease presented to us failed to create an express trust despite "trust language." Nor did it create an implied trust. We agree with the district and bankruptcy courts that the relationship between Sakowitz and Evans was one of debtor-creditor, not trustee-beneficiary.
 
 The judgment of the district court is
 
 49
 AFFIRMED.
 
 
 
 [1]
 At oral argument, counsel for Evans stated that, while she did not argue that genuine issues of material fact existed in her answer to the Banks' motion for summary judgment, she did so contend at the bankruptcy court hearing. The statement to which she apparently refers is "I think that it's clearly relevant and material what the parties' intentions and understandings were and I think that the affidavits demonstrate what the parties' intentions and understandings were in this case." [Emphasis added]. Even accepting arguendo that Evans' counsel meant that issues remained unresolved, we feel that this one oral statement, made at the end of the hearing, falls short of what was required to rebut the Banks' demonstration that no genuine issues of material fact existed
 
 
 [2]
 In his deposition, one of Evans' officers stated that "it was just additional security because those balances were owed to us, and it's a comfort provision to have that in there." We note that Evans also took out insurance on these accounts to protect itself against nonpayment by Sakowitz