**In re AMES DEPARTMENT STORES, INC., et al., Debtors.**

**LFD Operating, Inc., Plaintiff,**

v.

**Ames Department Stores, Inc. and Ames Merchandising Corporation, Defendants.**

**Bankruptcy No. 01–42217 (REG). Adversary No. 01–8139A(AJG).**

United States Bankruptcy Court, S.D. New York.

March 8, 2002.

---

Butler, Fitzgerald & Potter, P.C., Raymond Fitzgerald, of Counsel, New York City, for Plaintiff.

Weil, Gotshal & Manges LLP, Martin J. Bienenstock, Howard B. Comet, of Counsel, New York City, for Defendants.

*MEMORANDUM DECISION REGARDING PROCEEDS FROM THE SALE OF PLAINTIFF'S MERCHANDISE IN DEFENDANTS' STORES*

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### I. Introduction

On September 6, 2001, Plaintiff, LFD Operating Inc. ("LFD"), commenced this adversary proceeding against Defendants, Ames Department Stores, Inc. and Ames Merchandising Corporation (hereinafter, "Ames"), seeking the return of $8.9 million from Ames to LFD. LFD asserts its claim based upon a series of agreements that allegedly prescribe that the $8.9 million is the property of LFD and, hence, should be excluded from Ames's bankruptcy estates.

LFD is a licensee that sells footwear and other related merchandise in Ames's stores. Plaintiff seeks declaratory relief based on contract, agency, trust, and constructive trust principles. LFD's primary argument is premised on paragraph 41 of the relevant agreement between the parties, which provides that all proceeds from the sale of LFD merchandise shall be the property of LFD from the time of such sale, and that Ames shall act as LFD's agent and trustee until such time as the proceeds are paid over to LFD. In response, Ames contends that LFD is an unsecured creditor and therefore is not entitled to any return of funds. Ames argues that using the words "trust" or "agent" in a contract does not create a valid trust or agency in bankruptcy if a debtor is allowed to commingle monies and is not required to pay over funds immediately or on demand. Ames has cited to, among other things, a number of "store-within-a-store" decisions of various courts to support this proposition. In response to LFD's constructive trust theory, Ames contends that the equitable remedy of a constructive trust results in only an unse-

cured claim against the bankruptcy estate and therefore LFD is not entitled to any immediate payment.

In lieu of live testimony, the litigants submitted joint stipulated facts and deposition transcripts of all witnesses to this proceeding.[1] The witnesses to this adversary proceeding, organized alphabetically, are as follows:

- *Linda M. Cote*—Vice President of Planning and Treasury of Ames, deposed on November 9, 2001;

- *Rolando de Aguiar*—Chief Financial and Administrative Officer of Ames, deposed on November 2, 2001;

- *Kathleen Guinnessey*—Vice President of Finance for LFD's parent, Footstar, as well as Treasurer of LFD, deposed on November 2, 2001;

- *David H. Lissy*—Senior Vice President and General Counsel of Ames, deposed on November 9, 2001;

- *Stephen Metivier*—Underwriter and Portfolio Manager for General Electric Capital Corporation ("GECC"), deposed on November 8, 2001;

- *Maureen Richards*—Senior Vice President, Corporate Secretary and General Counsel of LFD's parent, Footstar, as well as General Counsel and Corporate Secretary to LFD, deposed on November 5, 2001;

- *Mark von Mayrhauser*—Vice President Controller of Ames, deposed on November 9, 2001; and

- *Elizabeth White*—Chief Financial Officer of Casual Male, formerly known as JBI Holding, Inc. ("Baker"), deposed on November 7, 2001.

The Court heard oral argument on the parties submissions, including their memoranda of law[2] and exhibits, on December 4, 2001. The following decision is the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as incorporated into this adversary proceeding under Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## II. Jurisdiction

The Court has subject matter jurisdiction of this matter under 28 U.S.C. §§ 1334(b) and 157(a) and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (E).

## III. Factual and Procedural Background

Ames and certain affiliated entities filed these voluntary chapter 11 cases on August 20, 2001. Ames is a regional discount retailer that operates, as of the filing of this complaint, approximately 452 stores in 19 states and in the District of Columbia. LFD is a licensee that sells footwear and related merchandise in Ames's stores. LFD is the assignee of an agreement entered into between Ames and Baker. The present controversy arose when Ames

---

**1.** In addition, the parties offered into evidence a transcript from a hearing before this Court on September 24, 2001 where the Court received testimony in connection with Plaintiff's earlier request for a temporary restraining order. The request for a temporary restraining order was denied on September 25, 2001.

**2.** In particular, LFD submitted "Plaintiff's Initial Written Submission in Lieu of Trial"

dated November 19, 2001 and "Plaintiff's Written Reply Submission in Lieu of Trial" dated November 30, 2001 (hereinafter, "Plaintiff's Brief" and "Plaintiff's Reply Brief" respectively). Defendants submitted a "Memorandum of Ames Department Stores, Inc. and Ames Merchandising Corporation in Opposition to Plaintiff's Initial Written Submission in Lieu of Trial," dated November 28, 2001 (hereinafter, "Defendants' Brief").

failed to remit certain payments to LFD totaling at least $8.9 million. Ames acknowledges that LFD is owed at least $8.9 million[3] and admits that Ames failed to make payments due and owing to LFD. The relevant background regarding this adversary proceeding is as follows.

## A. The Relationship Between Ames and Baker

By agreement dated November 17, 1987 ("Agreement"), Ames licensed Baker to operate shoe departments in various Ames stores ("Departments"), (Stipulation of Facts ¶ 1) (hereinafter "SF"). Baker was the owner of all merchandise that Baker sold in Ames's stores. (SF ¶ 2.) The Agreement required that Baker furnish and operate the Departments by purchasing and supplying fixtures, purchasing and supplying merchandise, and hiring all necessary personnel as Baker employees. (SF ¶ 2.) All sales of Baker merchandise were to be processed through Ames's cashiers, (SF ¶ 3), and the proceeds therefrom were processed through the regular channels of Ames's business.[4] (SF ¶ 12.) The Agreement states that "[a]ll proceeds of cash sales of merchandise in said department shall be paid directly to and handled directly by Ames'[s] cashiers and shall in no event . . . be handled by any representative or employee of Baker. . . ." (Agreement ¶ 4b at Ex. 1.) The Agreement also required that Ames keep a separate and distinct account and a separate and complete set of books and records of all sales of Baker's merchandise. (SF ¶¶ 5, 6.)

The Agreement required Ames to provide to Baker a weekly statement of Bak-

er's sales of merchandise from the second preceding week, not later than Friday. (SF ¶ 7.) Concurrently, with the delivery of the statement of sales, the Agreement also required Ames to pay to Baker the balance due from the same weekly statement after Ames deducted (1) the amount of commissions, fees and monies due and payable to Ames, and (2) the amount of any and all other charges against Baker's account made by Ames in accordance with the terms of the Agreement. (SF ¶ 7; Agreement ¶ 4b at Ex. 1.) The Agreement provides that:

"Net Sales" as such term is used in this Agreement shall mean the total (gross) amounts charged by Baker for or in connection with (1) any and all sales of goods, wares and merchandise and/or (2) all services rendered in, upon or from said department or from any part of the store in which the licensed premises are located by Baker, and the total (gross) amount of all charges for services performed by Baker in, upon or from any part of the licensed premises, and sales, wherever made, of goods, wares and merchandise of Baker stored or displayed in said department or in said store, whether such sales shall be for cash or credit. . . . "Net Sales" shall not include any customer returns, allowances, credits or refunds. . . .

(Agreement ¶ 3c at Ex. 1.)

In practice, the course of dealings between Ames and Baker resulted in Ames providing the statement of sales and payment for Baker's shoe sales on the Monday immediately after the Friday referred to in the Agreement. (SF ¶ 10.) Both the

---

**3.** Ames submits that LFD's prepetition claim is actually $9,292,577.05. (Defs.' Br. at 25.)

**4.** The actual wording of the Agreement that formulates SF ¶ 12, provides, in part, that "Ames agrees that all . . . cash proceeds (including checks accepted by Ames) from the

operation of said department to be conducted by Baker, shall go through the regular channels of the business of Ames, according to its usual and ordinary methods of doing business." (Agreement ¶ 4b at Ex. 1.)

statement of sales and the payment to Baker reflected one week's worth of sales for merchandise sold approximately two weeks before. (SF ¶¶ 7, 10; White Dep. at 8–9.)

The Agreement was amended as of April 29, 1989.[5] (SF ¶ 13.) *Amendment I,* among other things, added paragraph 41 to the *Agreement.* Paragraph 41 states in relevant part that:

> It is further confirmed and agreed that all proceeds from the sale of merchandise of Baker to customers . . . shall be the property of Baker from the time of such sale, that Ames shall act as Baker's agent in the collection and holding of such proceeds, and that Ames shall hold such proceeds in trust for Baker until such time as they are paid over to Baker. . . .

(*Amendment I* ¶ 13 at Ex. 2.)

Elizabeth White, Chief Financial Officer of Casual Male, formerly known as Baker, testified that it was her understanding that from 1987 to 2001 Baker's proceeds and Ames's proceeds were put into the same cash registers and bank accounts. (White Dep. at 5–10, 12, 22.) Ms. White was responsible at Baker for insuring that monies were received from Ames for Baker's footwear sales in the Ames stores. (White Dep. at 7.)

Testifying on the course of dealings between Baker and Ames, Ms. White stated that it was her understanding that after payments were made at Ames's cash registers for Baker merchandise, and prior to the time Ames made payment to Baker approximately two weeks later, Ames took the cash, checks and other means of payment from the cash registers and deposited them into bank accounts. (White Dep. at 8–9, 22.) Whatever bank accounts Ames was using, it was Ms. White's understanding that customer sales from Baker merchandise and Ames's other receipts were put into the same bank accounts. (White Dep. at 22.) Ms. White was unaware of any changes in the way Ames processed money from 1987 until Baker assigned its rights under the *Agreement* to LFD in 2001. (White Dep. at 9–11.)

Ms. White explained that the reason Ames kept an account of what Baker product was sold was to use that information to pay Baker.[6] (White Dep. at 17–18.) For instance, Ms. White testified that there was a point of sale record made by Ames that identified Baker merchandise sold at Ames stores. (White Dep. at 13–14.) This was accomplished through a so-called "stock-keeping unit" or "SKU" number that Ames had assigned to Baker merchandise. (White Dep. at 13–14.) Using this system, it was possible for Ames to track each and every item of sale through each individual Ames store. (White Dep. at 18, 19.) On a daily basis, Ames would report each and every sale to Baker by specific dollar amount. (White Dep. at 14–15, 18.) From the SKU information, Baker would generate a report of all sales of Baker merchandise sold in Ames stores on a daily basis. (White Dep. at 20.)

Ms. White possessed no knowledge of whether Ames could track cash proceeds from the sale of Baker merchandise. (White Dep. at 19.)

---

**5.** For the remainder of the discussion, when the Court refers to the April 29, 1989 Amendment to the Agreement, the reference will be to *"Amendment I"*. Subsequent amendments shall be numbered sequentially. All references to the Agreement, as amended, shall be to the *"Agreement"*.

**6.** The amounts required to be paid every week by Ames to Baker shall hereinafter be referred to as the "Net Sales Proceeds." (SF ¶ 9.)

## B. Ames's Previous Chapter 11 Filing

On April 25, 1990, Ames commenced a voluntary chapter 11 proceeding in the Southern District of New York (*"Ames I"*). (Lissy Dep. at 3–4; Defs.' Ex. 28.) *Ames I* ultimately consummated a plan of reorganization on December 30, 1992. (Lissy Dep. at 34.)

Beginning in June 1990, David Lissy was hired by Ames Department Stores, Inc., as a consultant and thereafter as vice-president and general counsel of Ames. (Lissy Dep. at 4.) During *Ames I*, Mr. Lissy had the overall responsibility for the legal issues dealing with *Ames I*, which included every prepetition claim against the bankruptcy estate of any significance. (Lissy Dep. at 5–6.)

Mr. Lissy testified that in connection with *Ames I*, Baker had a claim. (Lissy Dep. at 5–6.) Baker's claim totaled $13.7 million, as a consequence of Ames's failure to pay Baker for their prepetition collection of proceeds from the sale of Baker merchandise. (Lissy Dep. at 8; Defs.' Ex. 28.) In the *Ames I* proceeding, Baker's claim in *Ames I* was treated as an unsecured claim. (Lissy Dep. at 6–8; Defs.' Exs. 28, 29.) Mr. Lissy testified that, to the best of his recollection, at no time did anyone from Baker assert that Baker had anything but an unsecured claim. (Lissy Dep. at 6.) Baker's unsecured claim was for prepetition amounts not paid by Ames to Baker from the sale of merchandise for a period of time comparable to LFD's predicament in Ames's current chapter 11 cases. (Lissy Dep. at 30–31.)

In *Ames I*, pursuant to section 365 of the Bankruptcy Code, Baker's contract to sell shoes in Ames's stores was assumed by Ames as of the consummation date of the plan based on a stipulation agreement with Baker (the "Stipulation"). (Lissy Dep. at 6–7; Defs.' Ex. 28.) Mr. Lissy executed the Stipulation on behalf of Ames in *Ames I*. (Lissy Dep. at 7–8; Defs.' Ex. 28.) The terms of the Stipulation entailed a partial cash payment upon the consummation of a plan of reorganization, with the balance due subject to a promissory note secured by a mortgage on the home office of Ames Department Stores. (Lissy Dep. at 8–9; Defs.' Exs. 28, 29.) As part of the Stipulation, Ames and Baker amended the *Agreement* (*"Amendment II"*), but did not change the way Ames prospectively handled funds from Baker's shoe sales. (Lissy Dep. at 11–12; Defs.' Exs. 28, 29.) *Amendment II* included, among other things, modifications that enhanced the parties' ability to terminate the *Agreement* in the event Baker failed to achieve certain performance standards. (Defs.' Ex. 29.)

After consummation of the plan, Ames and Baker continued with their prepetition contractual relationship regarding footwear sales by Baker in Ames's stores until Baker assigned the contract to LFD. (Lissy Dep. at 9–10.) Mr. Lissy testified that Baker never requested that Ames change any of the procedures relating to the handling of the proceeds from Baker's shoe sales, including placing such funds into a trust account. (Lissy Dep. at 10–11.)

## C. Baker's Assignment of the Agreement to LFD

On February 3, 2001 and with Ames's consent, (SF ¶ 23), Baker assigned to LFD all of Baker's rights in and to the *Agreement*,[7] and LFD assumed all of Baker's obligations. (SF ¶ 22.) Pursuant to that assignment, LFD agreed that it would "assume, observe, perform, fulfill, and be

---

**7.** The *Agreement* was amended as of August 1, 2000 to add Ames Merchandising Corporation as a party to the *Agreement*. (SF ¶ 21.)

bound by all the terms, covenants, conditions and obligations" of the *Agreement.* (Ex. 5 at ¶ 3.)

Before the assignment to LFD, Baker had businesses in apparel retail as well as licensed footwear departments. (Guinnessey Dep. at 12.) LFD is a wholly owned subsidiary of Footstar Corporation. (Guinnessey Test. Hr'g on T.R.O. at 8, 44–45.) LFD and Footstar share common officers. (Guinnessey Test. Hr'g on T.R.O. at 45; Guinnessey Dep. at 5, 10–11; Richards Dep. at 4.) In February 2001, LFD/Footstar acquired all ongoing footwear businesses of Baker. (Richards Dep. at 8–9; Guinnessey Dep. at 12; Guinnessey Test. Hr'g on T.R.O. at 8–9.) The Baker assets sold to LFD/Footstar encompassed approximately 13 license agreements with retailers, including Ames. (Guinnessey Dep. at 12.) Some of the other major accounts LFD/Footstar acquired from Baker included Today's Man, Spiegel, Stein Mart and Roses. (Guinnessey Dep. at 11, 13.) Before the Baker acquisition, Footstar already operated footwear departments in stores like Kmart and Rite–Aid. (Richards Dep. at 22–23; Guinnessey Dep. at 13, 14.)

Maureen Richards, Senior Vice President, Corporate Secretary and General Counsel of LFD's parent, Footstar, as well as General Counsel and Corporate Secretary to LFD, testified that she was in charge of all the legal work concerning Baker's assignment to LFD, including due diligence. (Richards Dep. at 4, 8, 21; SF ¶ 59; Pl.'s Ex. 10.) Ms. Richards did not have any discussions with Baker or recollect seeing any documents from Baker concerning how Ames handled Baker's proceeds. (Richards Dep. at 8–10, 20, 21.) Ms. Richards was unaware of any communication with Ames concerning Ames's handling of the Baker proceeds. (Richards Dep. at 11.) Kathleen Guinnessey,

Treasurer of LFD, understood that as a result of Baker's assignment to LFD, LFD had succeeded to the relationship Ames had with Baker. (Guinnessey Dep. at 4–5, 25–26, 47–48; SF ¶ 54.)

Following the assignment from Baker to LFD, the procedures and relationships between the parties relevant to this proceeding remained the same as they existed between Baker and Ames prior to the assignment, as set forth below:

- LFD was the owner of all merchandise sold in Ames's stores. (SF ¶ 24.)
- All sales of LFD merchandise were processed through Ames's cashiers. (SF ¶ 28.)
- LFD knew the proceeds from LFD merchandise sold in Ames's stores were being received in the same cash registers that received proceeds from Ames's merchandise. (SF ¶ 65.)
- Sales of LFD's merchandise were identified at the point of sale at the cash register by SKU numbers which enabled Ames to identify and track the sales of LFD's merchandise. (SF ¶ 29.)
- LFD received daily transmissions from Ames's point of sale system that showed LFD's footwear sales. (Guinnessey Dep. at 57–60.)

In turn Ames:

- Maintained separate and distinct account records of all sales from LFD merchandise. (SF ¶ 27.)
- Did not maintain separate bank accounts for proceeds from the sale of LFD merchandise. (SF ¶ 67.)
- Used information from Ames's point of sale system to create a daily subaccount of the sales of LFD's merchandise. (SF ¶ 30; von Mayrhauser Dep. at 9–11.) On a weekly ba-

sis, the information from the sub-account was fed into Ames's general ledger system, which created an account that identified the amount of the sales of all LFD merchandise. (SF ¶ 30.)

- Used information from the point of sale system to accumulate the amounts that were applicable to LFD sales, and determined from those totals, using the contractual rate, how much had to be remitted to LFD on a periodic basis. (von Mayrhauser Dep. at 4, 9–12.) After calculating the amount of the Net Sales of LFD's merchandise, the only further deductions Ames would make in calculating the Net Sales Proceeds to be remitted to LFD are Ames's licensing fee, and an amount equal to 5% of the credit card fees that Ames is charged by credit card companies.[8] (SF ¶ 71.)

- Wired to LFD every Monday the amount of Net Sales Proceeds Ames calculated it owed to LFD for sales of LFD merchandise during the second preceding calendar week ending the second preceding Saturday. (SF ¶ 11.)

Of Ames's approximately $4 billion dollars in revenue for the fiscal year ending February 2001, approximately 4% was generated from the proceeds of LFD footwear sales. (de Aguiar Dep. at 31.) As of the filing of *Ames I*, Baker's sales through Ames were even greater than LFD's sales in Ames stores. (Lissy Dep. at 31.) Footstar's sales generated from the Kmart footwear departments are greater than LFD's sales from Ames's footwear departments. (Richards Dep. at 25.)

### D. Ames's Deposit Accounts

Under Ames's cash management system, funds collected by Ames's stores are deposited into local and depository bank accounts (the "Store Accounts") and, thereafter, transferred upon Ames's request, on a daily basis, to certain blocked accounts established by Ames (the "Blocked Accounts"), with Chase Manhattan Bank N.A. ("Chase"). (SF ¶ 42 n. 1; ¶¶ 42–44.) Additional operating income and corporate account remittances are periodically deposited into lock box accounts (the "Lock Box Accounts"), which are maintained by Fleet Bank N.A. (SF ¶ 42 n. 1; ¶¶ 42, 45.)

Sales proceeds from Ames's stores that are deposited in the Store Accounts include monies from the sales of both LFD's merchandise and Ames's merchandise. (SF ¶ 43.) Usually, the business day after monies are deposited in the Store Accounts, those monies are transferred to the Blocked Accounts. (SF ¶ 44.) Ames transfers the amounts contained in the Lock Box Accounts to the Blocked Accounts at least once a week. (SF ¶ 46.) Credit card processors wire funds representing credit card payments into the Blocked Accounts. (SF ¶ 47.) The monies in Ames's Blocked Accounts are transferred to a GECC concentration account on the day Ames's funds are deposited in the Blocked Accounts. (SF ¶ 48.)

### E. Ames's Credit Facility & Disbursement Account

As of March 2, 2001, Ames, and various affiliated entities, entered into a credit

---

**8.** The litigants do not dispute that the *Agreement* is silent on the origins of the 5% fee. They did not provide any explanation, other than pure speculation on the part of LFD, as to its origins. Mr. von Mayrhauser testified that the 5% fee for credit card charges predates Baker's assignment of the Agreement to LFD. (von Mayrhauser Dep. at 4–5, 17–19, 106–107.)

agreement (the "Revolver") with a syndicate of banks and financial institutions, including GECC as a lender and agent (hereinafter, the "Secured Lender" or "Secured Lenders"). (SF ¶ 35.) GECC was collateralized by, among other things, Ames's inventory as reflected in a stock ledger inventory report and cash proceeds from all sources. (Cote Dep. at 4, 12, 13, 15–16; Metivier Dep. at 8, 16, 22–24, 51, 54–56.) From at least February 2001, Ames's Secured Lenders would sweep all funds from the Blocked Accounts into a concentration account. (SF ¶ 49.) The funds swept by GECC were applied by GECC according to the terms of the Revolver. (de Aguiar Dep. at 17, 44, 50; Metivier Dep. at 45–47.)

Upon Ames's request, the Secured Lenders would advance money to Ames up to the limits of credit availability under Ames's Revolver. (SF ¶ 49.) Ames's Secured Lenders advance money to Ames by depositing money into a blocked Disbursement Account ("Disbursement Account") consisting of funds provided exclusively from GECC. (SF ¶ 50; Metivier Dep. at 48.) The Disbursement Account is used to fund the continuing operations of Ames, including payroll, and operating expenses. (SF ¶ 50 n. 2.) All payments made by Ames are made from this Disbursement Account. (Metivier Dep. at 49.) Ames is advanced funds in a lump sum that Ames can use to meet Ames's obligations.[9] (Metivier Dep. at 43–44.) GECC does not receive any documentation from Ames to trigger a payment from Ames to LFD. (Metivier Dep. at 43.)

Ames's credit advances under the Revolver are subject to reserve amounts. (Metivier Dep. at 27–30; Pl.'s Exs. 14–18.) A reserve amount reduces credit availability in the amount of the reserve. (Metivier Dep. at 27–42; Cote Dep. at 36; Pl.'s Exs. 14–18.) One of the reserve amounts under the Revolver was referred to as an ineligible shoe sales reserve (the "Reserve"). (Metivier Dep. at 27–30; Pl.'s Exs. 14–18.) The amount of the Reserve is based on a strict average of monthly historical payments that correspond to Ames's prior payments to Baker/LFD. (Metivier Dep. at 33–36.) Mr. Metivier's testimony indicates that the Reserve involved no actual segregation of proceeds from LFD shoe sales. (Metivier Dep. at 30.)

### F. Events Leading to Ames Current Chapter 11 Petition

Between February 3, 2001 and August 13, 2001, Ames's financial condition deteriorated significantly. (SF ¶ 51.) On August 12, 2001, the Board of Directors of Ames met and authorized the filing of a chapter 11 petition. (SF ¶ 52.) On August 13, 2001, Ames failed to turn over to LFD $2,036,000.00 in Net Sales Proceeds. (SF ¶ 53.) The amount that was due to LFD on August 13 reflects LFD sales from the week beginning Sunday, July 22, 2001 and ending Saturday, July 28, 2001. (Compl. ¶ 14.) On August 20, 2001 Ames filed a chapter 11 petition under the Bankruptcy Code. (SF ¶ 61.)

During the week before filing bankruptcy, Ames decided to preserve cash. (de Aguiar Dep. at 9.) Except for normal payroll, very few payments were made that week. (de Aguiar Dep. at 9–10.) The Chief Financial Officer of Ames, Rolando de Aguiar, testified that there was no specific discussion of the LFD payment before filing bankruptcy. (Defs.' Ex. 30; de Aguiar Dep. at 9, 13.) Based on a general discus-

---

**9.** The debtor in possession financing in this case operates in a substantially similar manner. (Metivier Dep. at 44.)

sion of payments, the size of the amounts due to LFD placed LFD's payment in a category of obligations that were not to be made before filing bankruptcy. (Defs.' Ex. 30; de Aguiar Dep. at 9.)

On August 15, 2001 Ames paid approximately $3.2 million in retention bonuses to 124 employees. (SF ¶ 58; de Aguiar Dep. at 10.) All of the 124 employees entered into written retention bonus agreements before receiving their payments. (de Aguiar Dep. at 15.) By way of example, Mr. von Mayrhauser received a retention bonus but committed to return the incentive if he did not remain employed for a certain period of time. (von Mayrhauser Dep. at 56–58.) Ms. Cote received a retention bonus for her agreement to remain employed by Ames Department Stores until March 1, 2002. (Cote Dep. at 11–12.) There was no discussion about the payment to LFD as compared to the retention bonuses. (de Aguiar Dep. at 12–13.) It was Mr. de Aguiar's belief that the retention bonuses paid to employees had nothing to do with Ames's nonpayment to LFD. (de Aguiar Dep. at 12–13.)

On August 13, 2001, Mr. de Aguiar instructed that no wire transfers be made. (de Aguiar Dep. at 62.) Ames does not pay all of its bills by bankwire or electronic transfer. (von Mayrhauser Dep. at 54.) Ames sometimes uses written checks from the Disbursement Account. (von Mayrhauser Dep. at 55.) On August 14, 2001, Kathleen Guinessey, the Treasurer of LFD, telephoned Mr. de Aguiar, and inquired why Ames had not wired to LFD the $2,036,000.00 in Net Sales Proceeds that was due on August 13, 2001 and when LFD could expect to receive payment. (SF ¶ 54; Guinnessey Dep. at 25–26.) Ms. Guinnessey testified that Mr. de Aguiar said that he would check on the status of the payment and get back to her that same day. (Guinnessey Dep. at 25–26.) During the conversation, Mr. de Aguiar did not disclose to Ms. Guinnessey that Ames had decided to file for bankruptcy relief under chapter 11. (SF ¶ 57.)

Mr. de Aguiar testified that he did not know whether LFD's weekly payment from Ames was made by bankwire. (de Aguiar Dep. at 5–6.) Subsequent to the telephone conversation with Ms. Guinnessey, Mr. de Aguiar ascertained that, in fact, no wire transfer had been made to LFD. (de Aguiar Dep. at 63.) Under instructions from counsel not to discuss wire transfers, Mr. de Aguiar did not telephone Ms. Guinnessey concerning the August 13 payment. (SF ¶ 56; de Aguiar Dep. at 63.)

On August 16, 2001 LFD's General Counsel, Maureen Richards, telephoned Ames's General Counsel, David Lissy, to discuss the August 13 payment. (SF ¶ 59; Richards Dep. at 12; Pl.'s Ex. 10.) During the conversation, Mr. Lissy informed LFD that Ames was not making any payments to creditors. (Richards Dep. at 13.) When Ms. Richards inquired whether Ames was holding monies in trust or as agent for LFD, Mr. Lissy questioned whether Ames was obligated to do so. (Richards Dep. at 13–14.) Mr. Lissy agreed to check on whether LFD might still be paid, and whether the monies were held in trust or as an agent for LFD. (Richards Dep. at 14.) The following day, Ms. Richards e-mailed Mr. Lissy. (SF ¶ 59; Pl.'s Ex. 10.) The e-mail, among other things, requested that Ames confirm that the Net Sales Proceeds were segregated and held in trust for the benefit of LFD. (Pl.'s Ex. 10.) On August 20, 2001, Ames failed to pay over to LFD $2,306,000.00 in Net Sales Proceeds. (SF ¶ 60.) That same day, Ames and certain affiliated debtors filed these chapter 11 cases. (SF ¶ 61.)

After the petition date, Ames failed to turn over Net Sales Proceeds due to LFD on August 27, September 3, and September 10, 2001. (SF ¶¶ 61–63, 74.) The Net Sales Proceeds due on September 10 are attributable to sales of LFD merchandise from August 19, 2001. (SF ¶ 74.) As of the filing of LFD's complaint, Ames has not paid LFD from the sale of LFD merchandise between July, 22, 2001 and August 20, 2001. (Compl.¶ 16.)

## IV. Discussion

The principle issue in this proceeding is whether the proceeds from the sale of LFD's merchandise in Ames's stores are LFD's property and, hence, excluded from Ames's bankruptcy estates. Section 541 of the Bankruptcy Code provides that a bankruptcy case creates an estate of property comprised of all legal or equitable interests of the debtor as of the commencement of the case. *See* 11 U.S.C. § 541(a)(1). Subsection 541(d) limits from the estate interests in which the debtor holds only a legal and not an equitable interest in property. *See* 11 U.S.C. § 541(d). According to COLLIER ON BANKRUPTCY:

> Subsection (d) re-emphasizes the provision of section 541(a)(1) that the estate is to be comprised of all legal or equitable interests of the debtor in property as of [the] commencement of the case. It also reiterates the general principle that an interest that is limited in the hands of the debtor is equally limited in the hands of the estate, and therefore, where the debtor holds bare legal title without any equitable interest, the es-

tate acquires bare legal title without any equitable interest in the property.

L. King et al., 5 COLLIER ON BANKRUPTCY ¶ 541.27 (15th ed. rev.2001).

Section 541(d) describes a typical trust situation: a trustee holds bare legal title to property for the benefit of one or more beneficiaries who hold the equitable title or interest in the trust property. *See Official Comm. of Unsecured Creditors v. Columbia Gas Systems Inc. (In re Columbia Gas Systems Inc.),* 997 F.2d 1039, 1059 (3d Cir.1993). Where the debtor's interest in property is limited to that of trustee, no other interest (including, the beneficiary's equitable interest) in that property becomes part of the estate. *Id.* Similarly, if property is in the debtor's hands as agent, the property or proceeds therefrom is not treated as property of the debtor's bankruptcy estate. *Rine & Rine Auctioneers, Inc. v. Douglas County Bank & Trust Co. (In re Rine & Rine Auctioneers, Inc.),* 74 F.3d 854, 857 (8th Cir.1996).

Therefore, the question the Court must address is whether Ames holds bare legal title without any equitable interest in the Net Sales Proceeds. If it were established that Ames holds bare legal title without any equitable interest, LFD would be entitled to the immediate payment of the Net Sales Proceeds of not less than $8.9 million. LFD argues that Ames holds only bare legal title, without any equitable interest, to the Net Sales Proceeds based on contract, agency, trust, and constructive trust theories.[10]

---

10. Whereas the Code defines property of the bankruptcy estate, interests in property are created and defined under state law. *See Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Thus, the underlying legal relationships between Ames and LFD are derived from state law and must be decided by state law. The Court's review of the *Agreement* did not reveal a "choice of law" provision and none was referenced by the parties. Both parties have cited to New York law. Therefore, the Court will apply New York law.

*A. Contract Theory*

▮ LFD maintains that the unambiguous terms of the *Agreement* between Ames and LFD require that this Court find that the Net Sales Proceeds of at least $8.9 million is Plaintiff's property. (Pl.'s Br. at 11; Pl.'s Reply Br. at 1.) The contract between Ames and LFD contains the express term that the proceeds from the sale of LFD's merchandise "shall be the property" of LFD. (Pl.'s Br. at 11; Pl.'s Reply Br. at 2.) LFD's contract theory is premised upon the fundamental rule of law that court's may not rewrite unambiguous provisions of an arms-length contract. (Pl.'s Reply Br. at 2, 3.)

▮ Plaintiff acknowledges that the relationship between contracting parties must be determined by its real character rather than by the form the parties have given it where the public interest or the rights of third-parties are involved. (Pl.'s Br. at 11; Pl.'s Reply Br. at 3–4.) *See Pan Am. World Airways, Inc. v. Shulman Transport Enters., Inc. (In re Shulman Transport Enters., Inc.),* 744 F.2d 293, 295 (2d Cir.1984) (citing *Quackenbos v. Sayer,* 62 N.Y. 344, 346 (1875)), *aff'g Pan Am. World Airways, Inc. v. Cont'l Bank (In re Shulman Transport Enters., Inc.),* 33 B.R. 383 (S.D.N.Y.1983). In *Shulman,* the Second Circuit found that in interpreting contractual relationships in bankruptcy, it is particularly important that substance not give way to form. *See Shulman,* 744 F.2d at 295.

The two cases forming the premise for the Circuit's finding in *Shulman* are instructive here. First, in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the Supreme Court examined whether the district court properly disallowed and subordinated a claim based on a state court judgment. The Court held that res judicata did not prevent a bankruptcy court from examining a state court judgment to ascertain the validity and priority accorded the judgment in the distribution of the bankruptcy estate. *Litton,* 308 U.S. at 302–03, 60 S.Ct. 238. Relying on the nature of bankruptcy courts as courts of equity, the Court observed that bankruptcy courts have exercised their equitable powers on a wide range of issues, including considerations that substance not give way to form in the administration of the bankruptcy estate. *Id.* at 304–05, 60 S.Ct. 238.

Second, the Court of Appeals for the First Circuit in *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981), examined whether funds collected by a travel agent upon the sale of airline tickets were held in trust in favor of the airline. Similar to here, the express terms of the relevant agreement provided that the ticket proceeds were the property of the airlines to be held in trust. *Morales,* 667 F.2d at 1071. Notwithstanding the terms of the agreement between the travel agency and the airlines, the First Circuit rejected the airlines' theory based on the express terms of the contract, by relying on, among other things, the debtor's everyday dealings with the ticket proceeds that evidenced a debtor-creditor relationship. *Id.* The court reasoned that if a ritualistic incantation of trust language were deemed conclusive where third-party interests are at stake in a bankruptcy case, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests. *Id.* at 1072.

Taken together, the authorities relied on by the court in *Shulman* suggest that principles of fairness and equity can override the express terms of an agreement in a bankruptcy case where there are indicia

of a contrary understanding.[11]

Here, Plaintiff contends that there are no rights of third-parties to be protected in this bankruptcy case because Ames's creditors could not have justifiably relied on the Net Sales Proceeds being Ames's property. (Pl.'s Br. at 12.) Plaintiff hinges this argument on, among other things, certain public disclosures filed by Ames with the Securities and Exchange Commission ("SEC"). LFD argues that Ames's unsecured "creditors were on either actual notice or constructive notice that the Net Sales Proceeds were not Ames'[s] property or, at a minimum, could not have justifiably relied to the contrary." (Pl.'s Br. at 13.) Thus, because Ames's creditors, as a result of the SEC disclosures, either knew, or had reason to know, that LFD had an interest in the Net Sales Proceeds, Plaintiff argues that there is no justification for the Court to rely on the authorities that find that the relationship between contracting parties must be determined by its real character, rather than by the form the parties have given it.

Plaintiff cites to no legal authority for the proposition that SEC disclosures are sufficient, without more, to provide actual or constructive notice of a right to proceeds. The commercially acceptable procedure for claiming an interest in proceeds is through Articles 2 and 9 of the Uniform Commercial Code ("UCC"). LFD's SEC disclosure argument vitiates and undermines the policies and provisions of the UCC. *See generally, United States v. Speers*, 382 U.S. 266, 275, 86 S.Ct. 411, 15 L.Ed.2d 314 (1965) (noting the general bankruptcy policy disfavoring unrecorded liens). Based upon the aforementioned, there is no justification for the Court to exclude this case from the Second Circuit's directive in *Shulman* that substance not give way to form in interpreting contractual relationships in bankruptcy. Therefore, the Court will interpret the parties relationship in the context of the substance of that relationship, not limiting the analysis to the form of the contract to determine the true relationship between Ames and LFD.[12]

■ The inquiry begins with the interpretation of the use of the word "property" in paragraph 41 of the *Agreement*. Here, Ames has collected the Net Sales Proceeds and commingled the funds in its depository accounts and used the funds in an unrestricted manner.[13] Baker was aware of

---

11. The Court notes that the discussion in *Shulman* has been applied to situations outside of the bankruptcy context. *See, e.g., Delta Air Lines, Inc. v. Tie Cargo Corp.*, No. 96–CV–3792 (JG), 1996 WL 1088913, at *2 (E.D.N.Y. Oct. 8, 1996) (rejecting the argument that the Second Circuit intended its discussion of agency to apply solely to bankruptcy cases).

12. The Court notes that Plaintiff renews a similar contract argument with respect to the use of the terms "trust" and "agent" in the *Agreement*. Specifically, LFD argues that notwithstanding the nature of the parties' contract, use of the words "trust" or "agent" should end this Court's inquiry. For the same rationale that the use of the word "property" is not dispositive of the ultimate issue before the Court, courts have found that the talismanic use of the word "trust," *see Morales*, 667 F.2d at 1072, or "agent," *Shulman*, 744 F.2d at 295, is equally unavailing. As considered in the discussion, the law relevant to this determination requires this Court to ascertain the nature of the parties' relationship to determine whether a trust or agency relationship was created between the parties.

13. The Court notes that the practical interpretation of a contract by the contracting parties, manifested by their conduct subsequent to its formation for a considerable length of time before it became the subject of controversy, is entitled to great, if not controlling, weight in the construction of a contract. *In re Dayton Seaside Assocs. # 2, L.P.*, 257 B.R. 123, 144 (Bankr.S.D.N.Y.2000).

and accepted this fact, notwithstanding the insertion of paragraph 41 to the *Agreement.* As a general rule, once funds are deposited in a bank account, the account holder is presumed to have title to and control over those funds. *See United States v. $79,000 in Account Number 2168050/6749900,* No. 96 CIV. 3493, 1996 WL 648934(MBM), at *4 (S.D.N.Y. Nov. 7, 1996) (applying this presumption to a bank account located in New York). The burden was on LFD to rebut this presumption. Here, LFD has failed to rebut the presumption that title and ownership of the Net Sales Proceeds vested in Ames upon deposit in Ames's depository accounts. Baker had ample opportunity over many years to address any concerns that it had with Ames's treatment of the Net Sales Proceeds but did not do so.

This finding is supported by the testimony of Ms. White and Mr. Lissy in connection with bank accounts and the parties course of dealings, the timing of *Amendment I* and the available record from Ames's prior bankruptcy. Certainly, when the debtors in *Ames I* sought to assume the *Agreement* Baker could have raised these issues in the context of adequate assurance of future performance. *See* 11 U.S.C. § 365(b)(1)(C). Although the record here does not specifically indicate whether any concern over the treatment of the Net Sales Proceeds was raised in *Ames I,* it is clear that the Stipulation and *Amendment II* do not reflect any change in Ames's collection and handling of funds. In addition, the Court's findings, *infra,* that Ames and LFD had a debtor-creditor relationship further supports the Court's conclusion that the Net Sales Proceeds were the property of Ames and not LFD. Therefore, the Court denies LFD's request for a declaration that the proceeds from the sale of LFD's merchandise is not property of Ames. The Court reaches this conclusion by applying the rationale provided by *Shulman* for interpreting contractual relationships and by applying the law relevant to funds placed in Ames's depository accounts.

**B. Agency & Trust Theories**

 LFD argues that Plaintiff should prevail under both an agency and a trust theory. In support of its agency theory, LFD argues that paragraph 41 of *Amendment I* unambiguously identifies Ames as LFD's agent for the collection and holding of the Net Sales Proceeds. That same paragraph identifies Ames as trustee and LFD as beneficiary of the Net Sales Proceeds held in trust.

> The distinction between a trustee and agent lies in the element of control and the extent of disposition of the property. A party who merely has possession of property of another and, although authorized to deal with that property, is subject to control by its owner, is an agent of the owner. A trustee, however, holds legal or equitable title to the property placed in his possession and may or may not be subject to the beneficiary's control. An agent-trustee is one who holds a title but is also subject to control by the beneficiary.

*S.E.C. v. Am. Bd. of Trade, Inc.,* 654 F.Supp. 361, 366 (S.D.N.Y.1987).

 Where there is an agent-trustee, it is the agency relation that predominates, and the principles of agency, rather than the principles of trust, are applicable. *See* I Austin Wakeman Scott & William Franklin Fratcher, The Law of Trusts § 8, at 95 (4th ed.1987) ("Scott on Trusts"). Nevertheless, the Court finds it appropriate for a more complete analysis of the issues to discuss each theory.

*(i) Agency*

 An "[a]gency is the fiduciary relation which results from the manifesta-

tion of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act. An essential characteristic of an agency relationship is that the agent acts subject to the principal's direction and control." *Shulman,* 744 F.2d at 295 (citing, among others, RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958)) (internal citation and quotation omitted). It is the element of continuous subjection to the will of the principal that distinguishes an agent from other fiduciaries. *Welding Metals, Inc. v. Foothill Capital Corp.,* No. 3:92CV00607 (WWE), 1997 WL 289671, at *8 (D.Conn. Apr. 14, 1997). Accordingly, if an alleged agent's acts concerning a certain subject matter cannot be controlled and directed by the principal, there is no agency relationship with regard to that subject matter. *In re Drexel Burnham Lambert Group Inc.,* 113 B.R. 830, 841–42 (Bankr. S.D.N.Y.1990).

When the existence of an agency relationship is uncertain, courts often look to the alleged principal's right to control as a critical indicator. *See Maritime Ventures Int'l, Inc. v. Caribbean Trading & Fid., Ltd.,* 689 F.Supp. 1340, 1353 (S.D.N.Y.1988). If the existence of an agency relation is not clear, as where the issue is whether a trust or an agency exists, the fact that it is understood that the alleged agent is not to be subject to the control of the alleged principal as to the manner of performance determines that the relation is not that of agency. *See* RESTATEMENT (SECOND) OF AGENCY § 14 cmt. b (1958). In New York, the sufficiency of control is a question of fact. *See Garcia v. Herald Tribune Fresh Air Fund, Inc.,* 51 A.D.2d 897, 897, 380 N.Y.S.2d 676 (1st Dep't 1976).

LFD cites to *Shulman* as the authority in this Circuit on the agency issue before the court. (Pl.'s Reply Br. at 7.)

*Shulman* recognized that if an alleged agent's acts concerning a certain subject matter cannot be controlled and directed by the principal, there is no agency relationship with regard to that subject matter. *See, e.g., Drexel Burnham,* 113 B.R. at 841–42.

In *Shulman,* the Second Circuit upheld the district court's affirmance of a bankruptcy court order rejecting Pan Am's claim of an interest superior to that of a secured creditor in Shulman's bankruptcy case. *Shulman,* 744 F.2d at 294. Shulman was an international freight forwarder that received freight from its customers and arranged for shipment with air carriers like Pan Am. *Id.* Shulman would arrange for transportation through various air carriers that belonged to a trade association called the International Air Transport Association ("IATA"). *Id.* Shulman received commissions from the carrier rate that Shulman charged its customers. Shulman's contract with IATA expressly identified Shulman as an agent for the air carriers and expressly provided that all monies received by Shulman were the property of the air carriers. *Id.* at 294–95.

Notwithstanding the express terms of the agreement, the Second Circuit approved of the district court's examination into the substance of the relationship between Shulman and the air carriers. *Id.* at 295. The district court observed that by relying on the authority of *Morales,* the bankruptcy judge properly found that the "agency" and "property" language employed in the agreement was a draftsman's device designed to insure that the carriers would be paid regardless of the debtor's solvency. *Pan American World Airways, Inc. v. Continental Bank,* 33 B.R. at 386. In *Morales,* the court relied on, among other things, Morales' practice of commingling and using alleged trust funds to hold that no fiduciary relationship existed

between the travel agency and the airlines. *Morales*, 667 F.2d at 1071. The court in *Morales* held that "[i]n the absence of any provision requiring Morales to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label 'trust' could in these circumstances and for present purposes have no legal effect." *Id.*

In finding that the district court did not err in holding that the money in Shulman's possession was not held in the fiduciary capacity of an agent, the Second Circuit ruled that "[a]bsent the critical element of control by Pan Am over Shulman's collection and handling of funds, Shulman cannot be said to have acted as Pan Am's agent for receipt of transportation charges." *Shulman*, 744 F.2d at 295 (footnote omitted). In that context, the Second Circuit distinguished the Shulman Pan Am relationship from that of agent and principal on the following grounds. First, Shulman was not subject to the air carriers direction and control because of Pan Am's apparent lack of concern over how Shulman received and handled the monies it collected. Specifically, there was no provision in their agreement that required Shulman to segregate funds from its general account or restrict Shulman's use of the monies once collected. Second, Shulman was not subject to the air carriers' direction and control because of Pan Am's apparent lack of concern as to whether and on what terms Shulman extended credit to its own customers. Shulman's extension

of credit included initiating legal action to collect delinquent debts. The IATA agreement did not contemplate Shulman extending credit or initiating legal proceedings. Thus, the Second Circuit observed that, based on a fundamental principle of agency law, Shulman was not an agent of Pan Am because Shulman was not subject to Pan Am's direction and control.

Another factor relevant to the court's conclusion that Shulman was not a fiduciary to Pan Am, was the fact that Shulman had no contractual duty to remit the proceeds of sale, but monthly payment out of debtor's general funds was sufficient. *Shulman*, 744 F.2d at 296 (quoting *In re Warner–Quinlan Co.*, 86 F.2d 103, 104 (2d Cir.1936)). *Shulman*, in turn, cited to a series of cases with similar factual elements to support this conclusion. *See id.* (citing *Morales*, 667 F.2d 1069; *Carlson, Inc. v. Commercial Discount Corp.*, 382 F.2d 903 (10th Cir.1967); *Chicago Cutter–Karcher, Inc. v. Maley (In re Lord's, Inc.)*, 356 F.2d 456 (7th Cir.1965); *In re Penn Central Transp. Co.*, 351 F.Supp. 1346 (E.D.Pa.1972)).

Here, Plaintiff argues that LFD was in control of the principal/agent relationship because LFD owns and controls the merchandise up to the point of sale. (Pl.'s Br. at 20.) In addition, LFD asserts that it was in control of the relationship at all times because Ames was required, among other things, to collect and submit information relating to LFD's sales.[14] (Pl.'s Br.

---

**14.** LFD cites to *Greenfield Direct Response, Inc. v. ADCO List Management (In re Greenfield Direct Response, Inc.)*, 171 B.R. 848 (Bankr.N.D.Ill.1994), among others, for the proposition that the ability to monitor the collection and remittance functions establishes that LFD had sufficient control over Ames to amount to a principal-agent relationship. This authority is distinguishable for the same reasons that the court in *Greenfield* distinguished the facts there from the authority

cited in *Shulman* and similar cases. In interpreting an agreement under Illinois law that required the debtor, as agent, to remit funds to the principal upon receipt of such funds, the court in *Greenfield* reasoned that within that context, there was nothing to control except for the monitoring of such collection and remittance functions. *Id.* at 857. Thus, control over these functions was enough to meet the test of agency. *Id.* This fact was ultimately used by the court to help distin-

at 20; Pl.'s Reply Br. at 16.) Plaintiff also cites to certain letters addressed to Ames's lenders from Footstar/LFD that purportedly establish that Ames and LFD regarded their relationship as that of agent/principal. (Pl.'s Reply Br. at 15–16; Exs. 8, 10 at T.R.O. Hr'g.) LFD's assertions overstate the significance of these facts and understate the precise issue before the court here.

Even assuming that LFD exercised some control over aspects of the Ames/LFD relationship, the issue before the court is not simply whether LFD exercised any measure of direction and control over Ames. The issue here, similar to *Shulman,* is whether LFD had the right to direct and control Ames's collection and handling of the Net Sales Proceeds and, therefore, whether Ames was LFD's agent in this specific capacity. *Shulman* recognized that if an alleged agent's acts concerning a certain subject matter cannot be controlled and directed by the principal, there is no agency relationship with regard to that subject matter. As applied here, the Court finds that Ames was not the agent of LFD for the remittance of the Net Sales Proceeds because LFD was not in control of the collection and handling of such funds. This conclusion is based on the findings that (i) Ames commingled the Net Sales Proceeds, (ii) Ames used the Net Sales Proceeds by placing funds in the Blocked Accounts to be swept by GECC, and (iii) Ames paid LFD from its general accounts with funds made available by GECC in Ames's Disbursement Account. These findings are also consistent with Baker's conduct in *Ames I* and the available evidence concerning which party bore the risk of loss on bounced check and credit transactions.

First, it is undisputed that the *Agreement* contained no provision that required that Ames place the Net Sales Proceeds in a segregated bank account. To the contrary, the *Agreement* requires that the proceeds be processed through the regular channels of Ames's business and, as discussed below, Ames has no restriction on the use of those proceeds. The discretionary element of determining the regular channels of Ames's business has, in practice, resulted in Ames commingling the Net Sales Proceeds in Ames's depository accounts with proceeds from non-Baker/LFD merchandise. LFD, therefore, has no control or right to control how the proceeds are processed by Ames and where the Net Sales Proceeds are ultimately deposited. Courts have found that the absence of a segregation of funds is inconsistent with an agency relationship. *Welding Metals,* 1997 WL 289671, at *8. This Court also finds that this element is inconsistent with LFD's assertion that it exercised control over Ames and the Net Sales Proceeds.

This finding is also supported by the record from *Ames I.* There is nothing to indicate to the Court that the original parties to the *Agreement* ever contemplated that *Amendment I* required that Ames place Baker's proceeds into a segregated bank account. On the contrary, the *Agreement,* according to its terms and a course of dealings thereto, only required that Ames keep a separate and distinct account of all sales of Baker merchandise. (SF ¶¶ 5, 6, 22.) It is undisputed that Ames

---

guish *Shulman* and similar cases. *Id.* at 858. ("The contract here did not require turnover at a specified settlement date, or on a monthly basis, or in a reasonable time, or at any other specified interval. Rather it provided for turnover upon receipt of funds by [the debt-or]. As a result, [*Shulman* and similar] trust cases are distinguishable."). Here, as considered more fully in the discussion, Ames collected, commingled, and used the funds at issue before any payment to LFD was due some two weeks later.

has kept such accounting records. (SF ¶¶ 5, 6, 27.) As discussed in section IV.A., *supra,* section 365 of the Bankruptcy Code provided Baker with an opportunity to raise the issue of adequate assurance of future performance of the *Agreement* if Baker believed that Ames was not acting in accordance with the *Agreement* as to the treatment of sales proceeds. It does not appear that the issue of Ames's treatment of sales proceeds was raised, and certainly if it was raised neither the Stipulation regarding its assumption under section 365 in *Ames I,* nor *Amendment II,* address this issue. Therefore, Baker's conduct in *Ames I* is consistent with a finding that the *Agreement* did not contemplate separate bank accounts. Ms. Richard's testimony on behalf of LFD suggests that notwithstanding its litigation posture in this adversary proceeding, the separation of Baker's funds into a segregated bank account was not material to the assignment of the *Agreement* from Baker to LFD.

Second, once the Net Sales Proceeds were placed in Ames's depository accounts, LFD had no control where and how Ames directed and used those funds. It is undisputed that Ames used the proceeds from the sale of LFD merchandise to pay Ames's Secured Lenders by placing those funds in the Blocked Accounts that were swept by GECC. It is self-evident that Ames could just have easily used those funds for any other corporate purpose— such as purchasing inventory, paying salaries, etc. Because LFD had no right to alter or direct any aspect of this process under the *Agreement,* LFD had no control over the use of the Net Sales Proceeds once the funds were placed in Ames's cash management system. The Court finds that this element is inconsistent with the control necessary for an agency relationship.

Finally, the amounts Ames actually paid to LFD every week, cannot be traced back to the precise funds Ames received from the sales of LFD's merchandise. Through Ames's cash management system, Ames used the proceeds from the sale of LFD merchandise to pay Ames's Secured Lenders by placing those funds in the Blocked Accounts that were swept by GECC. All payments made by Ames are made from a Disbursement Account. The funds made available in Ames's Disbursement Account are not the same monies from the sale of LFD merchandise. Ames's Disbursement Account is a blocked account funded exclusively through advances provided by GECC. Ames wires LFD weekly for payment of LFD merchandise sold in Ames's stores from general funds made available by GECC in Ames's Disbursement Account. Thus, Ames's obligation to LFD was satisfied by a payment from its Disbursement Account and there was no expectation or requirement that the actual proceeds from the sale of LFD merchandise be paid to LFD, less Ames's commission. This Court finds that this element is inconsistent with the fiduciary relationship necessary between principal and agent.

This finding is also supported by the record from *Ames I.* The parties' conduct in relation to *Ames I* indicates that so long as Baker was paid the Net Sales Proceeds due every week in accordance with the *Agreement,* the source of the payment was irrelevant. This finding is supported by the failure of *Amendment II* to address the issue of Ames's prospective handling of the proceeds from Baker's sales. Despite an opportunity to raise the issue regarding the manner that Ames prospectively handled sales proceeds in the wake of a $13.7 million unsecured claim in Ames's prior chapter 11 case, *Amendment II* did not address this issue. Mr. Lissy's testimony concerning the nature of Baker's claim went unrebutted.

The litigants briefed and addressed issues concerning credit and collection risks with respect to the sale of Baker/LFD merchandise. LFD contends that the *Agreement* does not require Ames to take any credit or collection risks. Ames argues that they assume certain risks because there is no provision in the *Agreement* for any deductions for bounced checks and failed credit transactions.

As support for the proposition that Ames assumed credit risk with respect to bounced checks, Ames cites to the unrebutted testimony of Ms. Cote to evidence that all bounced check transactions, including bounced checks from the purchase of LFD merchandise, are pursued by Ames through collection services. (Cote Dep. at 72–89, 93–94.) Because Ames's collection efforts do not result in any deduction from monies due LFD, (Cote Test. Hr'g on T.R.O. at 93–94), Ames contends that, at least in this respect, Ames bears the risk of not being paid. In response, LFD argues that Ames has voluntarily assumed this risk because the *Agreement* does not forbid Ames from charging back LFD. In so arguing, LFD does not expressly refute that LFD is not charged by Ames for bounced checks from the purchase of LFD merchandise. Here, Ames's practice of sending weekly payment to LFD in the absence of any adjustment for the bounced check transactions supports the conclusion that their relationship was more akin to a debtor-creditor relationship than that of

agent-trustee. In practice then, Ames bore the risk of not collecting on bounced check transactions that included LFD merchandise.

In further support of the proposition that Ames bore the risk of credit sales, Ames argues that it may advance credit to customers by any method Ames elects, (*Agreement* ¶ 4c at Ex. 1), and that Net Sales include the total amount charged by Baker/LFD for its sales in Ames stores whether such sales are for cash or credit, less deductions for "customer returns, allowances, credits or refunds." (*Agreement* ¶ 3c at Ex. 1.) Based on the wording that authorizes deductions from Net Sales, Ames concludes that this provision does not contemplate deductions for failed credit transactions, but only for problems with footwear merchandise resulting in "customer returns, allowances, credits or refunds." In response, LFD contends, *inter alia*, that Ames has never actually extended credit with respect to the purchase of LFD merchandise.[15] In addition, LFD argues that paragraph 4c of the *Agreement* demonstrates that because LFD granted permission for Ames to advance credit, this fact supports the inference that Ames was LFD's agent. However, a more logical inference to be drawn from this provision and the entire *Agreement* is that the risk of loss on the purchase of LFD's merchandise was to be borne by Ames. This conclusion is consistent with the terms of the *Agreement* as to credit exten-

---

**15.** Ames's extension of credit should be distinguished from third party credit cards which the parties stipulated Ames accepts for the purchase of LFD merchandise. (SF ¶¶ 42 n. 1, 64.) The risk of loss regarding the default on payments due to the credit card processors from Ames's customers presumably lies with the credit card issuer.

Ames's counsel argued that the risk of loss from the default on payments due to Ames from credit card processors is shouldered by Ames. See, for example, *World Travel Vaca-*

*tion Brokers Inc. v. Bowery Savings Bank (In re Chargit, Inc.)*, 81 B.R. 243 (Bankr.S.D.N.Y. 1987) of an adversary proceeding within in a case involving a failed credit card processor that defaulted on payments. Based upon the record before this Court, the risk that the credit card processor defaults on payment falls upon Ames and not LFD. The *Agreement* does not provide for the deduction of any defaulted payments from credit card processors.

sions and Ames's course of dealing with bounced checks. Although LFD suggests that Ames is compensated for whatever credit risks it does take because Ames subtracts a flat 5% fee for credit card charges that is proportionally greater than LFD's sales to Ames's total sales, there is no evidence in the record to establish a correlation for the position that LFD advocates. Indeed, LFD has produced no evidence to establish that the risk of loss was either intended under the *Agreement* or established by the parties course of dealings, to be born by LFD.

In sum, the Court finds that Ames was not the agent of LFD for the collection and remittance of Net Sales Proceeds because LFD has no right to control Ames's collection and remittance of the Net Sales Proceeds. Hence, the record supports the conclusion that Ames was not acting as a fiduciary for this purpose at any time under the *Agreement.* In addition, LFD has not proven that it bore the risk of loss on either the bounced check transactions or the credit sales provision under the *Agreement.* As a consequence, the Court denies LFD's request for a declaration that the proceeds from the sale of LFD's merchandise were held by Ames as an agent for LFD.

*(ii) Express Trust*

 An express trust is "a fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." RESTATEMENT (SECOND) OF TRUSTS § 2 (1959) ("RESTATEMENT OF TRUSTS"). Generally, four elements comprise an express trust: (i) a designated beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property suffi-

ciently designated or identified to enable title thereto to pass to the trustee; and (iv) the actual delivery of the fund or other property, or the legal assignment thereof to the trustee, with the intention of passing legal title thereto to him or her as trustee. *E.g., Brown v. Spohr,* 180 N.Y. 201, 73 N.E. 14 (1904).

 It is firmly established that if a recipient of funds is not prohibited from using the funds as his own and the recipient is not prohibited from commingling the funds with his own monies, a debtor-creditor relationship, not a trust relationship, exists. *Dampskibsselskabet Af 1912 Aktieselskab v. Black & Geddes, Inc. (In re Black & Geddes),* 35 B.R. 830, 836 (Bankr. S.D.N.Y.1984); *accord Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.),* 961 F.2d 341, 353 (2d Cir.1992) (stating same in discussing elements of a constructive trust); *see also Foothill Capital Corp. v. Clare's Food Mkt., Inc. (In re Coupon Clearing Serv., Inc.),* 113 F.3d 1091, 1101 (9th Cir.1997) (finding better guidance in a series of cases that do not find a trust where commingling of funds and payment out of general funds is sufficient); *Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.),* 269 B.R. 481, 495 (Bankr.E.D.N.Y.2001) (observing that the segregation of alleged trust funds is a factor that courts consider in distinguishing a trust and a debt in bankruptcy); *In re Einhorn,* 59 B.R. 179, 184 (Bankr. E.D.N.Y.1986) (finding that crucial factor in determining whether a trust relationship is created is the duty to segregate funds); *Leased Pet Dep'ts, Inc. v. Cook United, Inc. (In re Cook United, Inc.),* 50 B.R. 559, 561 (Bankr.N.D.Ohio 1985) (finding that an alleged trustee that commingles funds does not create a trust in a department store context). These cases are consistent with a trustee's duty to the

beneficiary to keep trust property separate from the trustee's individual property. *See* RESTATEMENT OF TRUSTS §§ 179; 179 cmt. b; 180 cmt. c.

■ In New York, if there is no distinct trust fund but merely a general obligation to ultimately pay a sum of money, then there is no trust, but only a debt. *See Petition of Travers*, 32 N.Y.S.2d 742, 743, 177 Misc. 1044, 1046 (Sup.Ct. Kings Co.1941); *see also Warner–Quinlan*, 86 F.2d at 104 ("If there was no contractual duty to remit the proceeds of sale but payment out of [debtor's] general funds was sufficient, an extension of credit [and not a trust] would be established."). This Court finds that the matter before the Court is sufficiently similar to the above stated authorities to dismiss Plaintiff's express trust theory.

■ Here, Ames has commingled the Net Sales Proceeds with all other proceeds from its stores since 1987. It is undisputed that the *Agreement* contained no provision that required that Ames place the Net Sales Proceeds in a segregated bank account. LFD has stipulated that it had no indication that Ames placed the proceeds from the sale of LFD merchandise in a separate bank account. (SF ¶ 66.) Through Ames's cash management system, Ames used the proceeds from the sale of LFD merchandise to pay its Secured Lenders by placing those funds in the Blocked Accounts that were swept by GECC. Ames paid LFD out of general funds made available by GECC in Ames's Disbursement Account. The funds made available in Ames's Disbursement Account are not the same monies from the sale of LFD merchandise. Ames's Disbursement Account is a blocked account funded exclusively through advances provided by GECC. Therefore, the Court finds that Ames did not hold the Net Sales Proceeds in trust for LFD because Ames, at all relevant times, has commingled the Net Sales Proceeds and used the funds between settlement dates for purposes other than paying LFD, before making payment to LFD out of general funds provided by GECC. These facts are dispositive of LFD's trust claim. Hence, the Court finds that the parties never manifested an intent to create a true trust mechanism and therefore Ames was not a fiduciary to LFD.

At oral argument on December 4, 2001, counsel for LFD argued that Ames's actual commingling of proceeds should not factor in the Court's determination. LFD contends that cash is fungible and, therefore, proceeds are sufficiently segregated where funds are identifiable on a separate basis, such as through a separate book entry in a business's accounting records. As support for this proposition, LFD's counsel argued that banks generally commingle monies from trust accounts. Because banks purportedly commingle monies from trust accounts and the integrity of the trust accounts are not questioned, LFD concludes that the physical isolation of cash is irrelevant. LFD justifies this result by reasoning that if there was a rigid requirement to segregate trust funds, then all trust accounts would operate like safe deposit boxes.

LFD directs the Court to no legal authority or evidence in the record for the proposition just articulated. In any event, LFD's argument improperly merges a trustee's duties to segregate trust funds with a bank's administration of deposits. Whereas trustees cannot properly deposit trust money in their personal bank account as an application of the rule that trustees have a duty to keep trust property separate from their own property, *see* RESTATEMENT OF TRUSTS § 180 cmt. c, LFD's argument presupposes that banks would assume a derivative duty to the

beneficial owners of a trust to place trust monies in a segregated bank account to maintain the integrity of the trust. This supposition is incorrect.

> If a general deposit is properly made by a trustee ... the bank does not become a trustee of the money but a debtor to the trustee. The trustee becomes a creditor of the bank and holds [the] claim against the bank in trust for the beneficiaries of the trust.... If the bank fails, the trustee or the beneficiaries are not entitled to priority over other creditors of the bank even though the money deposited is traceable.

V SCOTT ON TRUSTS § 527 (footnote omitted). *See also* RESTATEMENT OF TRUSTS § 180 cmt. a ("A trustee may deposit trust funds in a bank for the purpose of making the funds available from time to time for the payment of expenses or pending investment or distribution. This is a reasonable method for safekeeping of the funds, more reasonable than keeping the funds in a safe deposit box. This was true even before bank deposits were partially insured by the Federal Deposit Insurance Corporation; although the deposit was an unsecured loan, it was proper as a method of safekeeping."). Accordingly, because there is no basis for LFD's legal theory, the Court denies LFD's request for a declaration that the proceeds from the sale of LFD's merchandise are held in an express trust for the benefit of LFD.

### C. Constructive Trust Theory

LFD argues that it is entitled to a constructive trust on the Net Sales Proceeds because (i) Ames was a fiduciary to LFD, (ii) Ames made promises to turn over to LFD the Net Sales Proceeds, (iii) LFD relied on those promises in allowing Ames to collect and hold the Net Sales Proceeds,

and (iv) Ames would be unjustly enriched if it is permitted to retain the Net Sales Proceeds. (Pl.'s Br. at 21–22.)

Distilled further, LFD maintains a constructive trust is warranted because Ames was a fiduciary to LFD based on the *Agreement* and Ames's behavior in relation to the filing of its current and previous chapter 11 cases. Alternatively, and in the absence of a fiduciary relationship, LFD also claims that a constructive trust is justified because Ames converted the Net Sales Proceeds and, therefore, Ames was unjustly enriched. (Pl.'s Br. at 21–24.)

 "A constructive trust is an equitable remedy designed to prevent unjust enrichment, and restore legal title to one who, in equity, owns the *res*." *Tekinsight.com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 508 (Bankr.S.D.N.Y.2000) (collecting cases). Despite use of the term "trust" to describe this remedy, a constructive trust is not a division of the same fundamental concept underlying express trusts. *See* RESTATEMENT OF RESTITUTION § 160 cmt. a (1937) ("[An express trust and a constructive trust] are not species of the same genus. They are distinct concepts."). The purpose of a constructive trust is to prevent unjust enrichment, although unjust enrichment does not necessarily implicate the performance of a wrongful act. *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir.1999).

 In New York, a party seeking to impose a constructive trust must ordinarily establish four elements: (i) a confidential or fiduciary relationship; (ii) a promise, express or implied; (iii) a transfer made in reliance on that promise; and (iv) unjust enrichment.[16] *Koreag*, 961 F.2d at 352.

---

**16.** Courts have additionally required that the claimant establish proof of a *res* to which the constructive trust could attach and have required the claimant to trace the property.

Notwithstanding the stated requirements, the remedy is a flexible one, and the facts need not satisfy every element in all cases. For example, a court may impose a constructive trust in the absence of a fiduciary relationship, or wrongful conduct by the defendant. Even innocent parties may be unjustly enriched, and what is required is that the defendant hold property "under such circumstances that in equity and good conscience he ought not to retain it." *Stylesite*, 253 B.R. at 508–09 (citations omitted).

Despite the elasticity of the doctrine, the prevention of unjust enrichment remains the key requirement for a constructive trust. *See Securities Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 334 (Bankr.S.D.N.Y.1999). Unjust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain that benefit. *Counihan*, 194 F.3d at 361. Unjust enrichment is a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties. *A. Brod, Inc. v. SK & I Co., L.L.C.*, 998 F.Supp. 314, 328 (S.D.N.Y.1998). "The claimant to a constructive trust must establish the facts giving rise to the trust by clear and convincing evidence." *S.E.C. v. Credit Bancorp, Ltd.*, 138 F.Supp.2d 512, 532–33 (S.D.N.Y.2001) (citing *Caballero v. Anselmo*, 759 F.Supp. 144, 147 (S.D.N.Y. 1991)).

*(i) Ames as Fiduciary to LFD*

LFD contends that Ames undertook a fiduciary duty, under paragraph 41 of the *Agreement*, to act as agent and trustee to LFD. (Pl.'s Br. at 7, 22.) In addition to LFD's contract, LFD posits that Ames's knowledge that it would be filing a bankruptcy petition also gave rise to a fiduciary duty to LFD. (Pl.'s Br. at 22.)

LFD's first argument, that the *Agreement* imbued Ames with fiduciary duties, is unpersuasive because LFD is not able to establish that Ames acted as an agent or trustee for the Net Sales Proceeds under paragraph 41. As demonstrated in section IV.B., *supra*, of this discussion, the presence of language purporting to create an agency or trust is insufficient, without more, to conclude an effective agency or trust in a bankruptcy case where there are indicia of a contrary understanding. The Court has already found sufficient facts to contra-indicate the existence of an agency or a trust. Thus, LFD has failed to establish that its relationship with Ames was anything other than an arms-length contractual arrangement to make weekly payments based on LFD's sales.

In New York, no fiduciary relationship exists where parties were acting and contracting at arms-length to a business transaction. *See Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F.Supp. 770, 772 (S.D.N.Y.1985); *see also Oursler v. Women's Interart Center, Inc.*, 170 A.D.2d 407, 408, 566 N.Y.S.2d 295 (1st Dep't 1991) (stating that "[a] conventional business relationship, without more, does not become a fiduciary relationship by mere allegation"). Here, Ames was not a fiduciary to LFD because Ames and LFD entered into an arms-length contractual arrangement and arms-length contractual arrangements do not give rise to fiduciary relationships. The Court finds,

*Beekman Paper Co., Inc. v. St. Theresa Properties, Inc. (In re St. Theresa Properties, Inc.)*, 152 B.R. 852, 857 (Bankr.S.D.N.Y.1993).

The Court does not reach the issue of tracing in the context of constructive trusts.

therefore, that Ames was not a fiduciary to LFD based on paragraph 41 of the *Agreement.*

LFD's second argument is that Ames's knowledge that it would be filing for bankruptcy gave rise to a fiduciary duty to LFD. As support for its claim, LFD alleges that Ames engaged in "predatory acts and omissions by which it improperly induced LFD to continue to sell merchandise in order to maximize the Net Sales Proceeds Ames was holding at a time when [Ames] knew it would not be turning those proceeds over to LFD." (Pl.'s Br. at 22.) The basis for this assertion is that from February 3, 2001 to August 13, 2001, Ames's financial condition deteriorated to the point where bankruptcy was inevitable. (Pl.'s Br. at 22.)

As further support for its second argument, LFD concedes that although "[a] failure by a company headed toward bankruptcy to disclose the imminency of its bankruptcy may not, by itself, be a breach of fiduciary duty," Ames's conduct in *Ames I* coupled with Ames's behavior before the filing of the current chapter 11 case, reveals that Ames fraudulently induced LFD to continue selling merchandise. (Pl.'s Br. at 23.) LFD's argument is premised upon a telephone conversation that occurred on August 14, 2001 and retention bonuses Ames paid to some employees on August 15, 2001. (Pl.'s Br. at 23.)

 Under New York law, a fiduciary relationship exists when a person is under a duty to act or render advice for another's benefit. *See Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.,* 92 F.3d 1110, 1116–17 (11th Cir.1996) (applying New York law). To determine the existence of a fiduciary relationship, New York courts focus on whether one person has placed trust or confidence in another who thereby gains a resulting superiority or influence over the first.

*Breindel & Ferstendig v. Willis Faber & Dumas Ltd.,* 1996 WL 413727, No. 95 CIV. 7905(SHS), at *6 (S.D.N.Y. July 24, 1996). A commercial relationship may give rise to a fiduciary duty, but a fiduciary duty typically does not arise out of a contractual relationship between parties with comparable bargaining power where the duties of the parties are dictated by the terms of a contract. *Mia Shoes, Inc. v. Republic Factors Corp.,* 1997 WL 525401, No. 96 Civ. 7974(TPG), at *2 (S.D.N.Y. Aug. 21, 1997); *see also Compania Sud–Americana v. IBJ Schroder Bank & Trust Co.,* 785 F.Supp. 411, 425 (S.D.N.Y.1992) (concluding that fifty-year conventional business relationship did not create fiduciary duty). Instead, "the proper 'focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement.' " *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 767 F.Supp. 1220, 1231 (S.D.N.Y.1991) (quoting *Apple Records, Inc. v. Capitol Records, Inc.,* 137 A.D.2d 50, 55, 529 N.Y.S.2d 279, 281–82 (1st Dep't 1988)), *rev'd on other grounds,* 967 F.2d 742 (2d Cir.1992). As applied here, if there is nothing to suggest a relationship of trust or confidence and no evidence that any noncontractual duty is imposed as a matter of social policy as between Ames and LFD, the *Agreement* is insufficient to give rise to a fiduciary duty.

LFD argues that Mr. de Aguiar misled Ms. Guinnessey on August 14, 2001, by not disclosing, among other things, his decision to halt wire payments out of Ames. Mr. de Aguiar testified that there was no specific conversation (within Ames) concerning payment to LFD subsequent to Ames's decision to conserve cash for the bankruptcy. (Defs.' Ex. 30; de Aguiar Dep. at 9, 13.) In Mr. de Aguiar's August

14th telephone conversation with Ms. Guinnessey, Ms. Guinnessey asked about the status of the August 13th wire transfer LFD was expecting and Mr. de Aguiar told her that he would find out about the wire transfer. However, it is clear that at the time of the telephone conversation, Mr. de Aguiar knew that he had directed that no wire transfers were to be made and it would seem that LFD's payment would not have been made because of his directive. Thus, only if Mr. de Aguiar's directive was not followed, or some other form of payment was used, does it seem that the August 13th payment would have been made. Nonetheless, thereafter, Mr. de Aguiar verified that LFD's payment was not made. At that point, it is likely that Mr. de Aguiar knew that his directive to stop wire transfers was the reason why LFD had not received the August 13th payment. Yet, he did not return Ms. Guinnessey's telephone call because he was advised by counsel not to discuss the issue of wire transfers. Although Mr. de Aguiar on the August 14th telephone conversation arguably could have told Ms. Guinnessey as to what the likely result of his checking on the status of the August 13th wire transfer would be, this Court does not find that Mr. de Aguiar was under any obligation to do so. In any event, Mr. Lissy disclosed to Ms. Richards only two days later, on August 16th, that, in fact, Ames would not be paying its creditors at that time, including LFD. Accordingly, the court finds that the substantially contemporaneous telephone conversations between LFD and Ames the week before Ames filed for bankruptcy does not indicate that Ames induced LFD, much less fraudulently so, to operate within the Ames stores. Instead, LFD's argu-ment presupposes a correlation between the disclosure of certain information and LFD's continued operation of Ames's shoe departments. There is no evidence in the record to indicate that if either Ms. Guinnessey or Ms. Richards were told of Ames's imminent chapter 11 filing and Mr. de Aguiar's order not to issue wire transfers, that LFD would have taken any action with respect to the sale of LFD merchandise between August 14th and the filing of Ames's bankruptcy case on August 20, 2001. In addition, there is no evidence of what measures, if any, LFD could have taken in order to terminate their relationship with Ames.

As for the retention bonuses, Mr. de. Aguiar testified that there was no connection between the retention bonuses paid and the amounts due to LFD. Based on Mr. Mayrhauser's testimony and Ms. Cote's testimony, the retention bonuses were apparently paid prepetition as a reasonable attempt by Ames to insure that key individuals remained with the company through its reorganization process. Based upon the available record, the Court finds nothing untoward occurred as a result of Ames's prepetition retention bonuses in relation to any specific obligation Ames had toward LFD.[17]

In this case, LFD has failed to set forth dealings between Ames and LFD that suggest that such were not arms-length, or were so extraordinary in nature that they would normally give rise to a fiduciary relationship between the parties. There is nothing in the record to suggest a relationship of trust or confidence between Ames and LFD, nor the breach of any noncontractual duty imposed as a matter of social

---

17. This finding is limited to the relationship these bonuses have to the issues raised by LFD in this proceeding. The Court's finding should not be interpreted to endorse the ad-visability or appropriateness of the prepetition bonuses in relation to the captioned Debtors' chapter 11 cases.

policy. In contrast, the record is sufficient to establish that Ames, Baker, and LFD were all sophisticated parties with equivalent access to knowledge, in mutually beneficial arms-length commercial relations that defined the sum total of their dealings. Therefore, based on the facts before the Court, no fiduciary relationship existed as between Ames and LFD.

### (ii) Ames's Alleged Conversion and Unjust Enrichment as the Basis for a Constructive Trust

■■■ In the alternative, and in the absence of a fiduciary relationship, LFD also claims that a constructive trust is justified because Ames converted the Net Sales Proceeds and, therefore, Ames was unjustly enriched. As support for this proposition, LFD argues that conversion is a well recognized basis for the imposition of a constructive trust. (Pl.'s Br. at 23–24.) LFD's claim is based on the theory that, rather than hold the proceeds as required, Ames wrongfully subjected the proceeds to the lien of GECC and then turned those proceeds over to GECC. (Pl.'s Reply Br. at 20.)

■■■ Under New York law, conversion is any unauthorized exercise of control by one who is not the owner which interferes with a superior possessory right of another in property. *W.S.A., Inc., v. ACA Corp.*, No. 94 Civ. 1493(CSH), 1998 WL 635536, at *4 (S.D.N.Y. Sept. 15, 1998). To sustain a conversion claim, acts must be alleged that are unlawful or wrongful that are not a mere violation of contractual rights. *Fraser v. Doubleday & Co., Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y.1984). When money is the object of a conversion claim, the funds must be specifically identifiable. *Federation Internationale Du Sport Universitaire v. Greater Buffalo Athletic Corp.*, No. 93–CV–0635E(F), 1994 WL 411908, at *4 (W.D.N.Y. Aug. 4, 1994).

"[W]hen there is no contractual or other legal obligation to return the *identical* funds allegedly converted, but a mere relationship of debtor and creditor exists between the parties, an action for conversion of the funds which represent the indebtedness will not lie against the debtor." *Zacharia v. Schlossberg*, 16 Misc.2d 93, 95, 187 N.Y.S.2d 15, 18 (Sup.Ct.N.Y.Co.1959); *accord* 23 N.Y. JUR.2D, CONVERSION § 9, at 299 (2001).

The Plaintiff has failed to establish the elements of conversion as the basis for the imposition of a constructive trust for the following reasons.

First, LFD's conversion theory must fail because, as discussed more fully in section IV.A., *supra*, the Net Sales Proceeds are the property of Ames.

Second, the *Agreement* between Ames and LFD gives LFD no right of immediate possession to the Net Sales Proceeds. Instead, as discussed more fully in section IV.B., *supra*, LFD is paid at regular intervals from general funds made available in Ames's Disbursement Account. The funds in Ames's Disbursement Account are not the identical funds from the sale of LFD merchandise.

Third, as discussed more fully in section IV.B., *supra*, because the *Agreement* expressly contemplated that the Net Sales Proceeds were to be processed through the regular channels of Ames's business, its possession of such funds is not wrongful. Therefore, LFD cannot maintain that Ames was in the unauthorized possession of the Net Sales Proceeds.

In addition to LFD's failure to satisfy the elements of conversion as the basis for the imposition of a constructive trust, the Court finds that Ames has not been unjustly enriched. Unjust enrichment results when a person retains a benefit which, under the circumstances of the

transfer and considering the relationship of the parties, it would be inequitable to retain that benefit. *Counihan*, 194 F.3d at 361. "The existence of unjust enrichment is essentially a legal inference drawn from the circumstances surrounding the transfer of property and the relationship of the parties." *A. Brod, Inc.*, 998 F.Supp. at 328.

The relationship between Ames and LFD is arms-length and contractual in nature. Both LFD and Ames are sophisticated corporate entities with millions of dollars in revenues. Ames has operated under the *Agreement* in a consistent manner since 1987. Baker, the assignor of the *Agreement* to LFD, operated under the *Agreement* in a consistent manner up and until the Assignment to LFD in February 2001. LFD performed due diligence in relation to the purchase of the Baker assets. LFD did not ascertain whether Ames held the Net Sales Proceeds from the sale of Baker merchandise in trust or as agent for Baker despite the availability of the information from both Baker and Ames. Footstar/LFD operates similar shoe departments in other retail stores. LFD's Treasurer understands that LFD succeeded to the relationship between Baker and Ames. Since Baker's assignment to LFD, the commercial relationship between Ames and LFD is indistinguishable from the Ames/Baker relationship-that of debtor-creditor. Under the circumstances of this case and considering the sophistication of both Ames and LFD, the Court finds that it would be equitable for Ames to retain the benefits of the Net Sales Proceeds. A constructive trust will be erected whenever justice so requires, but a constructive trust in the instant case is not justified considering all the facts before the Court. As a consequence, the Court denies LFD's request for a declaration that the proceeds from the sale of LFD's merchandise are held by Ames in a constructive trust.

### (iii) The Availability of a Constructive Trust as a Remedy Under the Bankruptcy Code

Ames argues that even if the elements of a constructive trust were established, a constructive trust is nothing more than an equitable remedy that can be satisfied by a money judgment and hence a general unsecured claim entitled to ratable distribution from the bankruptcy estate. The leading case on the issue of equitable remedies and the definition of "claim" under § 101(5) the Bankruptcy Code is *CRS Steam, Inc. v. Engineering Resources, Inc. (In re CRS Steam, Inc.)*, 225 B.R. 833 (Bankr.D.Mass.1998), where the court held that a constructive trust is a claim under the Code. *Id.* at 840–842; *accord Stylesite*, 253 B.R. at 511. Here, the elements of a constructive trust were not met by LFD, therefore, the Court need not address the issue of its applicability in a bankruptcy case.

### V. Subrogation

LFD argues that it is entitled to stand in the shoes of Ames's secured creditors with respect to the $8.9 million of trust funds transferred to Ames's Secured Lenders in reduction of Ames's indebtedness. (Pl.'s Br. at 26.) LFD maintains that where a trustee wrongfully uses trust funds to discharge an obligation owed individually by the trustee to a third-person, the beneficiary is entitled to be subrogated to the rights that the third-party had before the obligation was discharged. (Pl.'s Br. at 26–27.) Under New York law,

[s]ubrogation, [is] an equitable doctrine . . . broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was

made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability.

*Gerseta Corp. v. Equitable Trust Co.*, 241 N.Y. 418, 425–26, 150 N.E. 501, 504 (1926).

Here, LFD's subrogation argument fails because the Court has already determined that there was no true trust mechanism between Ames and LFD. Therefore, the Net Sales Proceeds were not LFD's trust property and the funds used to pay Ames's Secured Lenders were Ames's property and not subject to any trust theory argued by LFD. As a consequence, the Court denies LFD's request for a declaration that LFD is subrogated to the rights of Ames's secured lenders to the extent of all prepetition proceeds from the sale of LFD merchandise.

## VI. Conclusion

For the reasons just stated, the Court finds: (1) that the proceeds from the sale of LFD merchandise are (a) not LFD's property, (b) not held by Ames as agent for LFD, and (c) are not held by Ames as express trustee for LFD; (2) that a constructive trust is not warranted under the facts and circumstances of this case; (3) that the elements of conversion have not been established to form the basis for the imposition of a constructive trust; and (4) that having failed to establish that the proceeds at issue were property of LFD under any of its theories, the claim for subrogation is denied. Therefore, all the claims contained in LFD's complaint for declaratory relief are hereby dismissed.

Defendants SETTLE ORDER and JUDGMENT.